IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CASE NO.: 1:21-CV-422-CCE-JLW

| | |
|---|---|
| BLUE FORCE TECHNOLOGIES INC.<br><br>Plaintiff,<br><br>v.<br><br>BETA TECHNOLOGIES, INC.<br><br>Defendant. | **NOTICE OF AMENDMENT OF THE COMPLAINT** |

**NOTICE OF AMENDMENT OF THE COMPLAINT**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 15(a)(1)(B)**

Plaintiff Blue Force Technologies Inc. ("**Blue Force**") hereby notifies the Court and

defendant Beta Technologies, Inc. that Blue Force will file an Amended Complaint as a matter

of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

Respectfully submitted,
*s/ K. Alan Parry*
K. Alan Parry
Email: kap@parryfirm.com
Parry Law, PLLC
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
T: 919-913-3320
F: 919-869-2600

-and-
*s/ Richard W. Bowerman*
Richard W. Bowerman (CT Bar # 04181)
Email: rbowerman@barclaydamon.com
Barclay Damon LLP
545 Long Wharf Drive, 9th Floor
New Haven, CT 06511
T: (203) 672-2668
F:  (203) 654-3275

1

# CERTIFICATE OF SERVICE

The undersigned hereby certify that the foregoing document was electronically filed using the Court's CM/ECF System, which will send notification to all counsel of record for the parties.

Dated: July 27, 2021

Respectfully submitted,
s/ K. Alan Parry
K. Alan Parry
Email: kap@parryfirm.com
Parry Law, PLLC
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
T: 919-913-3320
F: 919-869-2600

-and-

s/ Richard W. Bowerman
Richard W. Bowerman (CT Bar # 04181)
Email: rbowerman@barclaydamon.com
Barclay Damon LLP
545 Long Wharf Drive, 9th Floor
New Haven, CT 06511
T: (203) 672-2668
F: (203) 654-3275

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CASE NO.: 1:21-CV-422-CCE-JLW

| | |
|---|---|
| BLUE FORCE TECHNOLOGIES INC.<br><br>Plaintiff,<br><br>v.<br><br>BETA TECHNOLOGIES, INC.<br><br>Defendant. | **FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Blue Force Technologies Inc. ("Plaintiff" or "**Blue Force**") files this First Amended Complaint as a matter of right under Federal Rule of Civil Procedure 15(a)(1)(B) against Beta Technologies, Inc. ("Defendant" or "**BETA**") and alleges as follows:

## NATURE OF THE ACTION

1.      This First Amended Complaint is an action for relief and monetary damages for (i) breach of written contract; (ii) breach of oral/implied in fact contract; (iii) misappropriation of trade secrets under the NC Trade Secrets Protection Act and common law; (iv) misappropriation of trade secrets under the US Defend Trade Secrets Act; (v) tortious interference with prospective economic advantage; and (vi) unfair or deceptive business practices in violation of N.C. Gen. Stat. §75-1.1, (vii) declaratory judgment, (viii) unjust enrichment, (ix) tortious interference with contract, and (x) breach of the implied covenant of good faith and fair dealing.

2.      Plaintiff is a corporation that designs and manufactures composite structures for the commercial and defense aerospace markets, with a unique ability to design and build aircraft structures in a rapid, technically proficient, and cost-effective manner.  Defendant is in the business of developing and manufacturing electrically-powered Vertical Take-Off and Landing ("VTOL")

1

aircraft. The Parties entered into a Teaming Agreement, business relationship and contracts to pursue a design and manufacturing program for fully automated electric-powered VTOL aircraft for commercial, medical, and governmental customers. Defendant projects orders reaching 3,000 aircraft within about 10 years of the start of full manufacturing. After Plaintiff completed its obligations under the prototype phase of the program and further completed additional tasks that Defendant could not accomplish in the prototype phase, Defendant attempted to terminate Plaintiff from the program via written notification on May 7, 2021. In addition, Defendant engaged with other aircraft design, engineering, research and manufacturing corporations in violation of contractual right of first refusal provisions and with the intent of replacing Plaintiff and eliminating its rights and economic benefits from the program, including the contractual right to be prime contractor for the sale of aircraft to US Government agencies. On information and belief, at least some of the other aircraft design, engineering, research and manufacturing companies have been consultants to Plaintiff, and Defendant solicited Plaintiff's consultants in violation of the Parties' non-solicitation agreement. Plaintiff understands and believes that in doing so Defendant shared protected and confidential trade secret and proprietary information and intellectual property with third-parties or otherwise intentionally violated Plaintiff's rights with regard to its trade secret and proprietary information and property.

## THE PARTIES, JURISDICTION, AND VENUE

3.        Plaintiff Blue Force is a North Carolina corporation with its principal place of business in Morrisville, Durham County, North Carolina.

4.        Plaintiff alleges that at all times relevant herein, Defendant BETA is a Delaware corporation, registered in Vermont and with its principal place of business in Burlington, Vermont. BETA is also known as BETA Technologies Inc. (without a comma), BETA Technologies LLC, and formerly as Beta Air LLC.

5.        This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331(federal question jurisdiction pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(c)), 1332 (diversity jurisdiction), and 1367(a) (supplemental jurisdiction). The amount in controversy in

2

this action exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. In addition, this Court has supplemental jurisdiction over the State law claims asserted herein because they form part of the same case and controversy as the claims arising under Federal law, including arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("**DTSA**").

6.       This Court has personal jurisdiction over BETA consistent with the U.S. Constitution and N.C. Gen. Stat. § 1-75.4, including, without limitation, subsections (1)(d) and (5). BETA's conduct in, or directed to, the State of North Carolina has been committed by officers, directors, employees, and/or agents of BETA acting within the scope of their employment or agency. BETA has purposefully availed itself of the benefits and protections of the laws of the State of North Carolina and could reasonably anticipate being subject to the jurisdiction of courts of the State of North Carolina. BETA has transacted business in North Carolina, contracted to supply or obtain services in North Carolina, availed itself intentionally of the benefits of doing business in North Carolina, caused tortious damage by act or omission in North Carolina, caused tortious damage in North Carolina by acts or omissions committed outside North Carolina while engaging in persistent courses of conduct within North Carolina and/or deriving substantial revenue from services rendered in North Carolina, and committed acts and omissions that BETA knew or should have known would cause damage (and, in fact, did cause damage) in North Carolina to Blue Force while engaging in persistent courses of conduct within North Carolina and/or deriving substantial revenue from services rendered in North Carolina. This suit against BETA will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. On information and belief, BETA has sufficient minimum contacts with this State and District and is subject to the jurisdiction of this Court. BETA's contacts with this State and District include but are not limited to: (1) BETA negotiated and entered into agreements with Plaintiff regarding the subject matters of this Complaint in North Carolina; (2) performance by Plaintiff and BETA in North Carolina of the terms of the agreements between the Parties, including, but not limited to, the shared goal in the Teaming Agreement to create a prime contractor relationship for aircraft development and

3

production with United Therapeutics, a corporation with operations in Research Triangle Park, North Carolina; (3) business-related visits to North Carolina by BETA's CEO, directors and others in furtherance of the contractual relationship at issue in this Complaint, and in preparation of the wrongful termination of Plaintiff from the program and breach of the contract; (4) BETA's use, control and possession of Plaintiff's tangible property which was located in North Carolina at the time of its first use and/or possession and for which Plaintiff herein seeks recovery or damages for benefits derived by BETA; (5) Plaintiff's shipment of things of value from North Carolina to BETA at its direction, for which Plaintiff herein seeks recovery or damages for benefits derived by BETA; and (6) taking delivery of, and storing, tooling for prototype aircraft in a separate facility in North Carolina at BETA's expense and related to the subject matter of this civil action.

7.  Venue is proper in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) as a judicial district in which a substantial part of the events and omissions giving rise to the claims herein occurred and because Plaintiff maintains its principal place of business in this District.

8.  All conditions precedent to the filing of this action have occurred, have been fulfilled, waived, excused, or otherwise satisfied.

9.  The Plaintiff has engaged the undersigned counsel to represent it in the prosecution of this lawsuit.

## GENERAL ALLEGATIONS

10.  On January 19, 2011, Scott Bledsoe ("**Bledsoe**") incorporated Plaintiff Blue Force Technologies, Inc. ("**Blue Force**") and has served as its president since its founding. In 2017 Joseph Murray ("**Murray**") became associated with Blue Force and serves as its executive vice president. In 2019, Blue Force Technologies, Inc. (a Delaware corporation) was merged with and into Blue Force Technologies Inc. (a North Carolina corporation). Blue Force has always had its principal place of business in Durham County, North Carolina.

11.  In January 2017, Bledsoe became aware of Dr. Martine Rothblatt ("**Dr. Rothblatt**"), founder and CEO of United Therapeutics, and United Therapeutics' interest and effort

4

to utilize electric helicopters for medical delivery. Bledsoe engaged Dr. Rothblatt in discussions of alternative electric vertical takeoff and landing ("**VTOL**") aircraft solutions. Subsequently, Bledsoe and Murray were appointed by Dr. Rothblatt and United Therapeutics to manage the United Therapeutics Organ Delivery System ("**UTODS**") program. In late January 2017, Bledsoe and Murray introduced BETA and its CEO, Kyle Clark ("**Clark**"), to the UTODS program and Dr. Rothblatt.

12.     After introduction to UTODS, Clark sought and established a contractual relationship with United Therapeutics. Under this relationship, United Therapeutics paid BETA for a transcontinental flight of an electrically-powered helicopter to raise awareness of all-electric flight technologies. After entering this contract, Clark determined that a helicopter conversion was not feasible and decided to convert a fixed-wing airplane by adding rotors to allow it to complete VTOL and forward flight. This vehicle was known as "Ava." BETA's design of Ava struggled in its attempt to transition from hovering to forward flight and back. Blue Force established through aerodynamic analysis that acceptable transition was very high risk because of the aerodynamic properties of BETA's fundamental design for Ava. BETA never completed this transcontinental flight demonstration.

13.     On October 11, 2017, Blue Force and BETA entered into a Manufacturing Agreement related to propeller outriggers for Ava ("**Ava Manufacturing Agreement**"). A true copy of the Ava Manufacturing Agreement is attached hereto as **Exhibit A**, and incorporated herein as if fully set forth. The Ava Manufacturing Agreement was executed by Blue Force in North Carolina and expressly calls for it to be "interpreted, construed and enforced in accordance with the laws of the State of North Carolina, without regard to conflicts of laws rules". The Ava Manufacturing Agreement also contains a confidentiality provision stating that:

> Any information pertaining to either Party's business to which the other Party is exposed as a result of the relationship contemplated by this Agreement shall be considered to be "Confidential Information". Neither Party may disclose Confidential Information to any person or entity, except as required by law, without the express written consent of the affected Party.

5

14.     In December 2017, Blue Force started working on composite outriggers to mount the electric motors, gear boxes and propellers on Ava, and in furtherance of the broader contractual "relationship contemplated by this [Ava Manufacturing] Agreement."

15.     In January 2018, while work was progressing on Ava under the Ava Manufacturing Agreement, Blue Force and BETA met to discuss a new effort for design and production of an electric VTOL aircraft for United Therapeutics and/or Dr. Rothblatt. The new design would avoid the specific issues uncovered by Ava. Blue Force and BETA discussed various equity structures for this joint venture and agreed on Blue Force holding a long-term exclusive right of first refusal in structures for sharing the benefits of the venture between the Parties.

16.     On January 16, 2018, Blue Force executed a teaming agreement with BETA from its place of business in Morrisville, North Carolina ("**Ava Teaming Agreement**"). A true copy of the Ava Teaming Agreement is attached hereto as **Exhibit B,** and incorporated herein as if fully set forth.

17.     Under the Ava Teaming Agreement, Blue Force agreed to allow BETA to be designated the prime contractor for the electric VTOL aircraft development and production activity for United Therapeutics and/or Dr. Rothblatt. Blue Force also agreed to provide, at no charge to BETA, but at considerable expense to Blue Force, three suitable outriggers, one nose fairing, and introductions to flight test professionals.

18.     As consideration, and in exchange, for the above, Blue Force was granted a right of first refusal on all tasks relating to structural design, tooling, fabrication, and assembly. Specifically, under the Ava Teaming Agreement, the right of first refusal provision stated:

> Except for the pre-existing Ava aircraft project, [BETA] shall grant [Blue Force] the right of first refusal to be a subcontractor to [BETA] on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structure for programs where [United Therapeutics] or Dr. Martine Rothblatt is the customer.... [BETA] shall not solicit proposals from other structures providers while making a good faith effort to come to terms with [Blue Force].

6

In addition, the Ava Teaming Agreement granted Blue Force intellectual property rights for all inventions conceived by it while under contract not exclusively granted to United Therapeutics.

19.    In support of the Ava Teaming Agreement, Bledsoe accompanied the BETA team to meetings with United Therapeutics to assist BETA's effort to be designated as prime contractor for electric VTOL aircraft development and production. This took place from approximately January to July 2018, and included gathering information, performing engineering analysis, sharing financial details, and assessing strengths and weaknesses of competing proposals. BETA repeatedly reaffirmed the long-term mutual nature of the Parties' joint venture, including in terms such as a "we are going to be in a very good position to get to our mutual goal of design direction and to manufacturing", "it would be great to meet in person on Friday to address the longer-term program plans and how to bring this awesome opportunity to fruition," and "[t]he probability of this rolling into a manufacturing opportunity is not immediate, but real. There hasn't been any real pushback on the concept of doing composites for these aircraft in Raleigh…"

20.    On October 1, 2018, Blue Force and BETA entered into another contract in furtherance of their joint effort to bring to fruition the "opportunity" outlined in the Ava Teaming Agreement to win the aircraft development and production work from United Therapeutics for an electric VTOL aircraft. This contract is titled ALIA Structures Design, Development and Manufacture Phase I - Prototype Vehicle ("**ALIA Phase I Contract**"). This contract was originally executed digitally by the Parties, with Blue Force executing the contract in North Carolina. Subsequently, at a kickoff event, the contract was re-executed in person as part of the event, with a corrected party name. A true copy of the ALIA Phase I Contract is attached hereto as **Exhibit C,** and incorporated herein as if fully set forth.

21.    The ALIA Phase I Contract states in its Purpose provision that Blue Force and BETA "agree that the purpose of this contract is for [Blue Force] to participate in the development of all structural elements for an electrically-powered VTOL aircraft" and that the "aircraft will be designed with the intent to be manufactured by BETA and its partners with the intent of structure to be manufactured by [Blue Force] or in a facility supported by [Blue Force] and its technologies."

7

The Purpose provision also provides that "[t]he goal of the aircraft program is to initially produce sixty (60) aircraft by 2028 for United Therapeutics (UT) and a similar number for other markets (the "ALIA program")."

22.     The ALIA program is comprised of four phases, with the express understanding that the phases might overlap, as follows (quoting from Exhibit C, p. 4):

> Phase 1: Proof of Concept (PoC) ALIA-250 Aircraft - commences with a system specification and concludes with a successful demonstration of 250nm range of an all-electric, vertical takeoff and landing aircraft.
>
> Phase 2: Conforming Aircraft/Production Vehicle (PV) - begins with a design phase, includes a certification plan, basis and overall aircraft design, build and test.
>
> Phase 3: FAA Type Certification - begins after the certification basis is issued by the FAA and the implementation phase is started. Concludes with FAA Type Certification.
>
> Phase 4: FAA Production Certification - begins with production sourcing, design and planning which overlaps with the earlier phases and concludes with FAA Production Certificate issuance.

23.     The ALIA Phase I Contract has its own right of first refusal provisions, including:

> BETA shall continue to grant [Blue Force] the right of first refusal to be the exclusive supplier to BETA on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structures for projects for, or an aircraft substantially similar to, the ALIA configuration from UT, UT affiliates, or Dr. Martine Rothblatt. [Blue Force] shall propose such work under commercial rates consistent with what other customers have received in the preceding year. BETA shall not solicit proposals from other structures providers while making a good faith effort to come to terms with [Blue Force]. This Agreement supersedes the Teaming Agreement presented in Appendix A. (Quoted from Exhibit C, p. 3).
>
> Success in the initial phase of the program will result in a subsequent contract offer for rights of first refusal from BETA to [Blue Force] for Phase 2. (Quoted from Exhibit C, p. 4).
>
> BETA and [Blue Force] agree that each shall receive the right of first refusal on all design, development, research, and sales

8

opportunities developed by the other party in its area of expertise. (Quoted from Exhibit C, p. 12).

24.     The ALIA Phase I Contract also guarantees to Blue Force the right to purchase production aircraft for sale to the US Government, including serving as prime contractor with the US Government on any modifications. Specifically, the ALIA Phase I Contract provides:

> ... [Blue Force] shall have the exclusive right to purchase, under commercial pricing and terms, production aircraft from BETA which will be subsequently offered for sale to the US Government ("Federal Sales") by [Blue Force]. Such Federal Sales aircraft may be modified by [Blue Force] for purposes which are specific to the US Government's needs, and [Blue Force] shall serve as prime contractor for any such modification contracts... (Quoted from Exhibit C, p. 12).

25.     BETA was incorporated in 2017 and lacked the more mature workforce and aerospace industry status/certifications of Blue Force. Beginning in the second half of 2019, the Parties discussed various ways in which to elevate the participation of Blue Force in the ALIA program. This included potentially merging the companies and expanding Blue Force's effort in support of the program and the certification/production effort. During merger talks, BETA's CEO Clark described Blue Force's value to BETA's investors: "BETA presently lacks the formal quality and certification systems necessary for the FAA compliant vehicles and production vehicles."

26.     In December 2019, the Parties met in Morrisville, North Carolina and otherwise communicated with regard to the status of the program and the process for negotiating and signing the Phase 2 contract. In February 2020, the Parties met and corresponded with regard to various ALIA program matters, including resetting milestones that BETA had not achieved (such as the 250nm demonstration flight described in the ALIA Phase I Contract, p. 4), an order for a set of propellers to be manufactured by Blue Force, the possibility of building a second ALIA aircraft, and moving forward on the certification phases of the program and related phase contracts.

27.     Based on representations from BETA, Blue Force engaged with an FAA certification industry specialist to lead the structures certification effort but had to let him go to another opportunity when BETA refused to move forward on the certification efforts.

9

28.     Blue Force completed its obligations and deliverables under the ALIA Phase I Contract on March 27, 2020, all in substantial and material compliance with the contract. Blue Force sent mechanics on site to Vermont to work side-by-side with BETA, and this timeline was critical to both Parties because of BETA's commitment to complete a 250 nautical mile flight test, including vertical take-off, transition from vertical hover to horizontal flight, and back to vertical flight to land, in the second quarter of 2020. According to the ALIA Phase I Contract, upon completing its obligation, Blue Force was to be offered by BETA a contract for Phase II of the ALIA program.

29.     In October 2020, an industry magazine featured Blue Force's contribution to the ALIA program, including the manufacturing of composite structures for the ALIA 250 aircraft by way of Blue Force's proprietary infusion-based process.[1] Additionally, Blue Force was contracted to build a 2nd ALIA airframe, with custom-designed modifications to make the vehicle suitable for two prospective customers: United Parcel Service and the US Air Force.

30.     In February and August 2020, Blue Force communicated to BETA that it was ready to move forward on the certification phases and the opportunities afforded in the rights of first refusal. Blue Force also noted in these communications that it was talking to investors interested in funding Blue Force's growth, including with respect to the right of first refusal opportunities under the ALIA program. In response, BETA's CEO Clark replied, stating:

> [In my opinion] it's not too early to get into this properly. In fact, I have been behind on this front with many other fundamental technology challenges and our own financing work on the plate. Thank you for putting this on paper… We clearly need to come to an RFP/SoW level with enough clarity to put cost and terms on it soon to the benefit of [Blue Force], BETA and our ability to meet our mission.

31.     On October 29, 2020, BETA provided Blue Force a one-page "ALIA Production

---

[1] Composite aerostructures in the emerging urban air mobility market | CompositesWorld, by Jeff Sloan, Editor in Chief ( October 13, 2020): https://www.compositesworld.com/articles/composite-aerostructures-in-the-emerging-urban-air-mobility-market.

Forecast" outlining aircraft production for each for the next 10 years of approximately 3,000 electric VTOL aircraft. A true copy of the "ALIA Production Forecast" is attached hereto as **Exhibit D,** and incorporated herein as if fully set forth. The ALIA Production Forecast was provided to Blue Force in part to help it develop manufacturing plans for the production of the aircraft structures pursuant to this forecast. Blue Force developed a new factory model, did factory optimizations and capital equipment planning, including paying external parties to develop a conceptual factory design, in response to the production forecast.

32.     On November 11, 2020, and again on December 9, 2020, during program management meetings/calls, BETA's CEO Kyle Clark stated that BETA was working on a draft statement of work for Blue Force covering the certification, design, and production work under the ALIA program.

33.     Between August 2020 and May 2021, when BETA sent its purported termination letter, Blue Force had 20 to 30 discussions with credible investors interested in the growth of Blue Force based in part on the ALIA program and ALIA Phase I Contract provisions and right of first refusal opportunities.

34.     On December 13, 2020, Blue Force completed all integration work on a second ALIA program aircraft. By this time, Blue Force had supported, from its facility in Morrisville, North Carolina, numerous tasks under the ALIA program, ALIA Phase I Contract and the Parties' contractual relationship including: (1) one complete ALIA airframe of a passenger/medical configuration; (2) one complete ALIA airframe in a unique cargo configuration; (3) one set of hover propellers; (4) one set of transition flight propellers; (5) two flight simulator fuselages; (6) two sets of custom electric motor stators; and (7) multiple instances of engineering support for structural modifications requested by BETA. Engineering support continued through the filing date of the original complaint.

35.     Throughout February 2021, the Parties engaged in correspondence regarding the additional work available to Blue Force under the ALIA program, including the notional ALIA Phase II Contract. This included transmission of a proposed request for proposal (RFP) and master

11

servicing agreement (MSA) by BETA on March 1, 2021. Transmission of the RFP and MSA would start the clock on an official proposal response from Blue Force to BETA.

36.     As the "exclusive supplier to BETA on all tasks relating to structural design, tooling, fabrication and assembly" ("**Exclusive Supplier Role**"), Blue Force reached out to other aerospace companies to explore filling subordinate supplier roles on the ALIA program. One of these potential subordinate suppliers was Spirit AeroSystems (a/k/a Spirit Engineering, a/k/a Spirit Aerospace; collectively "**Spirit**"). In discussions with Spirit, Blue Force discovered that Spirit had already been in substantive discussions with BETA on providing design, engineering and manufacturing services on the ALIA program in violation of the ALIA Phase I Contract's right of first refusal provision which provided that "BETA shall not solicit proposals from other structures providers while making a good faith effort to come to terms with [Blue Force]." Exhibit C, p. 3.

37.     When confronted with the information about Spirit, Kyle Clark, CEO of BETA, acknowledged that BETA been in discussions with Spirit, and in addition, Triumph Aerostructures, Bombardier Aviation, and others, regarding matters falling within the Exclusive Supplier Role under the above referenced right of first refusal provision. Clark stated he would contact Spirit to greenlight discussions between Spirit and Blue Force in order to provide assurances to Blue Force that BETA would honor its obligations to Blue Force under the ALIA program, ALIA Phase I Contract and the contractual relationship between the Parties. However, Spirit stopped responding to Blue Force and never signed a proprietary information agreement related to business opportunities arising from Blue Force's rights of first refusal under the ALIA Phase I Contract.

38.     Upon information and belief, BETA was engaged in discussions with Spirit since at least the beginning of February 2021, in violation of the above referenced right of first refusal provision. Upon further information and belief, by the end of February or early March 2021, BETA had formed a manufacturing partnership with Spirit in direct violation of this right of first refusal provision and the contractual relationship between the Parties. During the same time period, BETA again approached Blue Force to initiate a discussion of a merger between them.

39.     Blue Force also reached out to GKN Aerospace Services Limited ("**GKN**"), Daher

12

Aerospace ("**Daher**"), and other suppliers to investigate potential business relationships relating to Blue Force's right of first refusal under the ALIA Phase I Contract. Blue Force and these potential subcontractors entered proprietary information agreements in which potential subcontractors agreed not to circumvent Blue Force in pursuit of the opportunities with BETA disclosed pursuant to the agreements.

40.      In March and early April 2021, BETA canceled in-person site visits and did not attend standing executive management meetings with Blue Force.

41.      On May 5, 2021, ALIA was publicly announced as the first manned electric VTOL aircraft to achieve airworthiness approval from the US Air Force. This significant achievement required extensive involvement from Blue Force's engineering staff, and relied heavily upon Blue Force's proprietary manufacturing processes and certifications. Had BETA notified the Air Force of its termination prior to official US Air Force airworthiness approval, the approval almost certainly would have been impacted and/or delayed. BETA finally informed Blue Force of the termination two days later on May 7, 2021.

42.      On April 22, 2021, Clark and fellow BETA board member David Churchill came to the Blue Force facility in Morrisville, North Carolina to discuss the next phase of the ALIA program. Blue Force presented a plan that would meet BETA's aggressive schedule for 35 "conforming but not certified" airframes by the end of 2023. Both Clark and Churchill expressed the importance of the working relationship with Blue Force noting its agile and collaborative approach was important in BETA's effort to establish and meet a desired schedule with the U.S. Air Force and United Parcel Service as well as maintain the schedule with United Therapeutics. Moving forward with preparation in support of future sales to the U.S. Air Force was additionally significant because such sales would constitute Federal Sales under the ALIA Phase I Contract for which Blue Force was contractually entitled to participate. The ALIA-Production Forecast projects 850 aircraft sales to the U.S. government, which Blue Force estimates will result in revenue between $4 billion and $5 billion. *See* Exhibit D. BETA also expressed an interest in greater access to two of Blue Force's key personnel.

43.     As a result of this meeting in Morrisville, North Carolina, Blue Force prepared and sent a quote for Blue Force to immediately start on the structural layout, the FAA certification plan for structures, and to begin creating the structures RFP packages to send to subordinate suppliers. In addition, Blue Force worked to make the key personnel requested by BETA available.

44.     On April 28, 2021, BETA failed to participate in a program management meeting. Thereafter it failed to respond to several follow-up emails regarding the ALIA program work outlined by Blue Force after the April 22, 2021 meeting in Morrisville, North Carolina. Finally, on April 29, 2021, BETA board member David Churchill responded with a vaguely encouraging email, apologized for the delay, explaining that they were getting new personnel up to speed, but working "to figure out the best way to move forward." On May 3 and 4, 2021, Blue Force followed up with BETA on moving forward on the work discussed at the April 22, 2021 meeting in Morrisville, North Carolina. On May 7, 2021, Blue Force offered to go to BETA's headquarters the following week and present a proposal on the design, certification and manufacturing of the fuselage.

45.     Later that day, on May 7, 2021, BETA's CEO Kyle Clark sent an email purporting to terminate the contractual relationship between the Parties, including the VTOL efforts, the ALIA program, and the ALIA Phase I Contract (the "**Termination Letter**"). The Termination Letter stated in part as follows:

> Scott,
>
> Thanks again for the time hosting us in NC.
>
> I've been reflecting on the next steps that best serve the ALIA program and to move on to a mutually beneficial relationship given the new shape of the program. …
>
> We have decided to issue the RFP now to Tier 1 suppliers to carry out the production of the airframe per BETA specifications and requirements in approximately 30 days. Specifically the Tier 1 will be asked to produce all primary structures. One important goal here is to have commonality in processes and materials between the major airframe components and employ an automated production technology where possible. We have been introduced to several Tier 1 suppliers including Spirit, Triumph and others. Each are highly motivated to work on this program for the reasons we discussed in NC. These suppliers have the equipment and bandwidth to fulfill the needs of the program.

14

We have additionally assembled an internal BETA team that has generated requirements for ALIA and will be doing the layouts. The first 5 key hires are now in place and we are adding 5-10 near term. We at BETA will drive the structures program and will direct the selected Tier 1 suppliers as needed.

…

On the engineering front, it isn't realistic to have [Blue Force] participate in the engineering layout due to the potential friction in confidentiality concerns with the selected Tier 1 supplier. …

The formatality (sic) of this communication is we are electing to terminate our existing Phase 1 program effective in 30 days. After this time will issue RFPs to alternate suppliers.

…

46.     On May 18, 2021 BETA announced that it had raised $368 million in a private funding round to support continued development of an integrated system for electric vertical aviation, and its announcement identified logistics, medical, government, and passenger travel as key aviation market segments that BETA serves. As part of this funding round, BETA committed to producing a third ALIA prototype aircraft, but BETA failed to present the opportunity to produce prototypes, including the airframe and propellers, for this aircraft to Blue Force in violation of Blue Force's rights of first refusal.

47.     The ALIA Phase I Contract also includes a mutual non-solicitation clause. Specifically, the ALIA Phase I Contract provides:

> Neither party shall offer to employ, contract with, solicit employment, offer employment, or induce any of the other party's employees or consultants to leave their current employer for at least 12 months after the termination of this contract. (Quoted from Exhibit C, p. 15)

48.     On information and belief, BETA has solicited Blue Force consultants, including Nick Wilson, to work directly for BETA in breach of the non-solicitation clause of the ALIA Phase I Contract. On further information and belief, BETA has been working with Spirit since at least February of 2021 on a contract for design, development, tooling, and production structures using potential subcontractors that Blue Force disclosed to BETA with the understanding that these subcontractors would support Blue Force in building structures for the ALIA program at a rate of

1,000 per year. One potential subcontractor, GKN, has terminated its Proprietary Information Agreement with Blue Force. On information and belief, BETA urged GKN to terminate its agreement with Blue Force either directly or through Spirit. On information and belief, BETA has solicited and entered contracts with Spirit, GKN, and other potential Blue Force subcontractors in contravention of Blue Force's contractual rights.

49. <u>The Breach</u>. Beginning on or about December 2020, upon information and belief, BETA shared Blue Force's "Background IP", airframe manufacturing technologies and processes ("**Airframe Mfg IP**"), trade secrets and proprietary information with third parties, including aviation design and manufacturing suppliers that compete generally with Blue Force and have been engaged in discussions by BETA regarding the ALIA program, the novel aircraft configuration for electric VTOL aircraft for the purpose of displacing Blue Force under the ALIA Phase I -IV Contracts and the ALIA program. For example, as noted in the Termination Letter, preliminary discussions with "several Tier I suppliers" who, in response, are "highly motivated to work on this program for the reasons [the Parties] discussed in NC" including the "important goal of commonality in process and materials" would necessarily require the sharing of some of the above-referenced protected technologies and process, trade secrets and propriety information. Such confidential information has been protected from disclosure in both the ALIA Phase I Contract (Exhibit C) and the Ava Manufacturing Agreement (Exhibit A). The AVA Manufacturing Agreement term extends to 3 years beyond the use of the referenced outriggers in test or return of the outriggers to Blue Force, provided the Parties mutually agree to termination. The AVA Manufacturing Agreement is still in full force and effect, including its provision for the application of North Carolina law. On or around May 7, 2021 Defendant further breached the ALIA Phase I Contract and the ALIA/electronic-VTOL program contractual relationship by its wrongful termination and the repudiation of Blue Force's rights thereunder. BETA has failed to cure such breach, is still in breach, and that breach is continuing (collectively, the "<u>Breach</u>"). The Breach includes, without limitation, breach of the obligations of good faith and fair dealing, the purported termination of the ALIA Phase I Contract, the purported elimination of Blue Force from the ALIA

16

program, solicitation of Blue Force's consultants, direct solicitation of potential subcontractors identified by Blue Force, and failure to honor the rights of first refusal, right to serve as prime contractor on US Government sales, and right to BETA's technical data in support of US Government sales.

50.     In breach of the ALIA Phase I Contract, the ALIA program, the Teaming Agreement, and the contractual relationship between the Parties from the Ava Manufacturing Agreement forward, BETA refused to present Blue Force with the Phase II, III or IV contracts, and wrongfully terminated or attempted to terminate the above-referenced rights of first refusal and exclusive rights to purchase and serve as prime contractor on US Government sales, among other things.

51.     In further breach of the ALIA Phase I Contract, BETA denied Blue Force its right to serve as prime contractor on the sale of approximately 850 aircraft to the US Government, which is expected to generate between $4 billion and $8 billion in revenue.

52.     Consistent with BETA's purported Termination Letter, BETA failed to show up and/or participate in the standing program executive management meeting scheduled for May 12, 2021.

53.     On May 14, 2021, Bledsoe sent an email to Clark requesting clarification as to "how do we get in alignment over the rights we earned by partnering on this effort back in 2018? Of course, based on your projected production numbers for the next 10 years, [Blue Force's] expectation of work from the Alia program is rather significant." As of the date of this Complaint, Blue Force has not received a reply.

<div align="center">

**COUNT ONE**
**(Breach of Written Contract)**

</div>

54.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

55.     Blue Force and BETA entered into the Ava Manufacturing Agreement, Exhibit A, for the terms set forth therein, which are sufficient to establish the mutual assent of the Parties to

<div align="center">17</div>

the essential terms of their agreement, and it was supported by consideration. This agreement calls for the application of North Carolina law and contains an entirety provision. Subsequently, Blue Force and BETA entered into the ALIA Phase I Contract, Exhibit C, for the terms set forth therein, which are sufficient to establish the mutual assent of the Parties to the essential terms of their agreement, and it was supported by consideration. The ALIA Phase I Contract does not contain an entirety provision.

56.     Beginning in or around December 2020 through the present, BETA committed the Breach of these written agreements between the Parties, as noted above, and the Breach is continuing.

57.     Through the time of each element of the Breach and thereafter, Plaintiff fully performed its obligations under both the ALIA Phase I Contract and the AVA Manufacturing Agreement. All conditions precedent to Blue Force's rights under the agreements occurred or were otherwise satisfied.

58.     BETA's Breach has caused and will cause Blue Force actual damages as alleged herein and according to the proof at trial. Based on production estimates by BETA over the next 10 years, the present value of lost net earnings to Blue Force proximately caused by the Breach is approximately $259.1 Million ($259,100,000.00). In addition, Blue Force will suffer foreseeable compensable consequential damages proximately arising from the Breach, including the loss of the opportunities to be the prime contractor on commercial and/or US Government sales. BETA has acknowledged in an article published May 18, 2021 that it raised $368 Million in one round of private fundraising to support continued development of an integrated system for electric vertical aviation. BETA's article identifies several market segments, including government, medical, logistics and passenger travel that will benefit from the ALIA program. The value of the ALIA program participation and the rights of Blue Force under the contracts and contractual relationship with BETA as set forth herein with regard to the right to be prime contractor on other commercial and US Government sales, is believed to be a multiple of the $368 Million raised in this one private funding round.

18

## COUNT TWO
### (Breach of Oral/Implied in Fact Contract)

59.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

60.     On or about January 2018, the Parties decided to join forces to develop and produce electric VTOL aircraft, first for United Therapeutics and for general commercial and governmental customers (the "Opportunity"). This joint contractual effort was reflected in the Teaming Agreement, Exhibit B, Phases I-IV of the ALIA program, and The ALIA Phase I Contract. This joint contractual effort was also confirmed several times by Plaintiff and Defendant orally in conversations. It is also evidenced by the anticipated progression of contracts for the various phases of the ALIA program, the various rights of first refusal referenced in this Complaint and the exhibits, and the miscellaneous purchase orders and requests for additional work in support of the ALIA program, performed by Blue Force after January 2018. In all, these actions are sufficient to establish the mutual assent of the Parties to the essential terms of their agreement as necessary to form an enforceable contract.

61.     Blue Force and BETA entered into the above-referenced joint contractual effort and it was supported by consideration as outlined previously, including the exchange of mutual promises, preparatory steps in reliance, performance entry into the Teaming Agreement and the ALIA Phase I Contract.

62.     Beginning in or around December 2020 through the present, BETA committed the Breach of oral/implied in fact contract between the Parties, encompassing their contractual relationship for joint effort on electronic VTOL aircraft, including the ALIA program and all its phases.

63.     Through the time of each element of the Breach and thereafter, Blue Force fully performed its obligations under oral/implied in fact contract and contractual relationship. All conditions precedent to Blue Force's rights under the agreements occurred or were otherwise satisfied.

19

64.     Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages.

<div align="center">

**COUNT THREE**
**(State Misappropriation of Trade Secrets and Proprietary Information)**

</div>

65.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

66.     Plaintiff is the owner of certain trade secrets and proprietary information (**"Trade Secrets"**), including:

    (a) The Background IP listed in the ALIA Phase I Contract;

    (b) The airframe manufacturing technologies and processes developed in the ALIA program;

    (c) The information pertaining to Blue Force's business to which BETA was exposed to as a result of the above-referenced contractual relationship between the Parties;

    (d) The use of Blue Force's facility, and the credibility afforded to the Alia program by Blue Force's performance, and personnel for marketing, promotion, and investor discussions; and

    (e) Sales leads information from prospective customers disclosed to BETA by Blue Force under the deconfliction provision of the ALIA Phase I Contract.

67.     Defendant knew or should have known of the Trade Secrets.

68.     The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

69.     Plaintiff takes reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

<div align="center">

20

</div>

(a) Taking security measures to protect data from disclosure through logins and passwords;

(b) Requiring Non-Disclosure Agreements and/or contractual provisions, such as in the exhibits hereto, to protect Trade Secret information from disclosure;

(c) Creating and enforcing appropriate use policies;

(d) Training/warning employees and contractors with regard to protecting Trade Secrets; and,

(e) Appropriate marking of Trade Secret data as "Proprietary" or "Confidential."

70.      Defendant had the specific opportunity to acquire the Trade Secrets during its business and contractual relationship with Plaintiff in which Plaintiff entrusted Defendant with copies of and/or access to Trade Secret information in furtherance of the contractual relations related to the Opportunity and the various written agreements between the Parties.

71.      Defendant did in fact acquire and use the Trade Secrets for its own and separate benefit without the Plaintiff's express or implied consent or authority, and thereby misappropriated Plaintiff's trade secrets within the meaning of N.C.G.S. §66-152 *et seq*. and the common law, including upon information and belief the sharing of Blue Force's Trade Secret information with its aviation supplier competitors.

72.      Plaintiff is entitled to a preliminary injunction against the continued misappropriation and misuse of its Trade Secrets pursuant to N.C.G.S. §66-154(a). Because BETA's actions have and will cause irreparable injury to Blue Force, Blue Force is entitled to have BETA's misappropriation, disclosure and use of Blue Force's trade secrets enjoined by this Court; all such trade secrets, in tangible form, returned to Blue Force; and all documents and things created from Blue Force's trade secrets destroyed.

73.      Plaintiff has suffered actual damages proximately caused by Defendant's misappropriation of Plaintiff's trade secrets in an amount to be proven at trial pursuant to N.C.G.S.

§66-154(b).

74.     Defendant's misappropriation of trade secrets was willful and wanton and Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C.G.S. §66-154(c).

75.     Defendant's misappropriation was in bad faith and was willful and wanton, and Plaintiff is therefore entitled to recover its attorneys' fees from Defendant pursuant to N.C.G.S. §66-154(d).

## COUNT FOUR
### (Federal Misappropriation of Trade Secrets and Proprietary Information)

76.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

77.     Blue Force's Trade Secrets are related to products and services intended for interstate commerce and meet the definition of "trade secret" under 18 U.S.C. § 1839(3).  BETA's conduct constitutes misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b).

78.     BETA's conduct has caused and will continue to cause damage to Blue Force for which it is entitled to recover in an amount to be proven at trial.

79.     BETA's conduct is taken knowingly, willfully, maliciously, and with reckless disregard for Blue Force's rights.  Accordingly, Blue Force is entitled to recover from BETA exemplary damages of up to two times its actual damages, and attorney's fees, pursuant to 18 U.S.C. § 1836(b)(3) and other applicable law.

80.     In addition to its recovery of monetary damages and because BETA's actions have and will cause irreparable injury to Blue Force, Blue Force is entitled to have BETA's misappropriation, disclosure and use of Blue Force's trade secrets enjoined by this Court; all such trade secrets, in tangible form, returned to Blue Force; and all documents and things created from Blue Force's trade secrets destroyed.

22

## COUNT FIVE
### (Tortious Interference with Prospective Economic Advantage)

81.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

82.     Blue Force has a significant and real expectation of prospective customers, including the expressly referenced US Government customers, interested in electric VTOL aircraft, especially as modified by Blue Force to meet their specific requirements.  In addition, Blue Force was in talks and various stages of negotiations with potential aviation industry investors that would expand Blue Force's business, capabilities, and status in the industry, with a significant economic benefit to Blue Force and therefore to Durham County, N.C.

83.     BETA was aware of these prospective economic advantages, and, in fact, the opportunity to expand to a broader customer base was part of the consideration in the contractual relation between the Parties outlined in this Complaint.  In addition, Blue Force had specifically notified BETA of the identities of certain prospective commercial and/or US Government customers it was pursuing.

84.     BETA's actions in purporting to eliminate Blue Force from the ALIA program, failing to honor the rights of first refusal, engaging competitors to displace Blue Force from its Exclusive Supplier Role and in sharing, not protecting and/or not returning its Trade Secret information has wrongfully, intentionally and tortiously interfered with Blue Force's prospective advantages referenced herein, including coopting for itself the opportunities to pursue other commercial and US Government customers.

85.     Defendant's actions in so interfering with Blue Force's prospective customers and prospective advantage are malicious and without justification.

86.     Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

87.     Defendant's actions were willful, wanton, and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

23

## COUNT SIX
### (Unfair or Deceptive Business Practices)

88.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

89.     BETA's conduct as set forth herein is unfair and deceptive within the meaning of N.C. Gen. Stat. §75-1.1.  Such conduct includes timing the Breach after having received full performance from Blue Force and cooperation from Blue Force in helping BETA achieve extracontractual tasks that proved difficult for BETA, and in the pretense of discussing progressing the ALIA program with Blue Force while at the same time engaging Blue Force competitors in negotiations to displace Blue Force from its rightful opportunities under the ALIA program, including the sharing of Trade Secret information with prospective substitute providers in violation of Blue Force's Exclusive Supplier Role.  In wanton and reckless disregard for Blue Force's rights, Blue Force also claims that BETA engaged in unfair and deceptive business practices by engaging in the tortious interference with Blue Force's contracts with consultants and potential subcontractors, including Nick Wilson and GKN.

90.     BETA's unfair and deceptive conduct is occurring in, and affecting, commerce.

91.     BETA's unfair and deceptive conduct proximately caused actual damages to Blue Force.

92.     Blue Force is entitled to recover treble damages from BETA pursuant to N.C.G.S. §75-16.

93.     BETA's unfair and deceptive conduct was willful and without justification, entitling Blue Force to recover its reasonable attorneys' fees from BETA pursuant to N.C.G.S. §75-16.1.

## COUNT SEVEN
### (For Declaratory Judgment)

94.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

95.     A declaratory judgment is cognizable and appropriate in this case under 28 U.S.C.

24

§ 2201(a), The Declaratory Judgment Act, and the North Carolina Uniform Declaratory Judgment Act, N.C.G.S. § 1-253, *et seq*.

96.     All Parties who have or claim any interest which would be affected by the requested declaration herein are Parties to this civil action.

97.     Plaintiffs seek a declaration to construe the rights and obligations of the Parties under the contracts alleged in this Complaint, including as reflected in the exhibits hereto.

98.     An actual controversy exists between the Parties with regard to the rights, obligations and remunerations owed under the contracts.

99.     Wherefore, Plaintiff prays that this Court enter a declaratory judgment, declaring as follows:

   (a) Blue Force is the "exclusive supplier to BETA on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structures";

   (b) Blue Force has the exclusive right to purchase production aircraft "for sale to the US Government" and the right to BETA's "technical data" to support sales to the US Government; and

   (c) Blue Force has the "right of first refusal on all designs, developments, research and sales opportunities developed by [BETA] in its area of expertise."

### COUNT EIGHT
#### (For Unjust Enrichment)

100.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

101.     To the extent a contract is not found at trial to exist between the Parties with regard to the broader joint efforts toward the electronic-VTOL aircraft development, the ALIA program,

25

including Phase II, III & IV and/or sales opportunities to US Government/Military agencies, Blue Force is entitled to damages and relief for unjust enrichment of BETA.

102.     Blue Force rendered services and incurred expenses toward these efforts for the benefit of BETA and for which BETA materially benefitted. BETA was aware of, and consciously accepted, the benefits afforded by Blue Force toward these broader joint efforts. These benefits were not conferred upon BETA gratuitously or in any manner that interfered with BETA's business affairs.

103.     Blue Force is entitled to be paid fair compensation as determined at trial for the value of the benefits received by BETA, which were conferred by Blue Force as described herein.

## COUNT NINE
### (Tortious Interference with Contract)

104.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

105.     Blue Force has had valid contracts with consultants and potential subcontractors, including, Nick Wilson, GKN, Daher, and others.

106.     On information and belief, BETA knew of these contracts and the responsibilities of each consultant and potential subcontractor thereunder.

107.     On information and belief, BETA has induced, or attempted to induce, consultants and potential subcontractors not to perform their respective contracts. GKN has terminated its Proprietary Information Agreement with Blue Force.

108.     As a result of BETA's interference with Blue Force's contracts, Blue Force has suffered damages including harm to its relationships with its consultants and potential subcontractors and loss of business opportunities contemplated by Blue Force's contracts with its consultants and subcontractors.

109.     Defendant's actions in so interfering with Blue Force's consultants and potential

26

subcontractors are malicious and without justification.

110.     Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

111.     Defendant's actions were willful, wanton, and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

<div align="center">

**COUNT TEN**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

</div>

112.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this Complaint as though fully set forth herein.

113.     BETA's conduct has injured Blue Force's rights to receive the benefits of the Parties' agreements, thereby breaching the implied covenant of good faith and fair dealing inherent in each contract. BETA breached its express covenants to refrain from: (i) "solicit[ing] proposals from other structures providers while making a good faith effort to come to terms with [Blue Force]," and (ii) "offer[ing] to employ, contract with, solicit employment, offer employment, or induce any of the other party's employees or consultants to leave their current employer for at least 12 months after the termination of this contract". (Quoted from Exhibit C, pp. 12, 15)

114.     Pursuant to the ALIA Phase I Contract, Blue Force disclosed its consultants and potential subcontractors to BETA with the expectation that it would be the prime contractor on the ALIA program and other aircraft prototyping projects. Blue Force also disclosed certain prospective commercial and/or US Government customers it was pursuing.

115.     BETA's actions in purporting to eliminate Blue Force from the ALIA program, failing to honor the rights of first refusal, engaging competitors to displace Blue Force from its Exclusive Supplier Role, breaching the non-solicitation clause of the ALIA Phase I Contract, not protecting and/or not returning its Trade Secret information has wrongfully and intentionally injured Blue Force's rights to receive the benefits of the ALIA Phase I Contract, including the opportunities to pursue other commercial and US Government customers referenced herein.

<div align="center">

27

</div>

116.     Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Blue Force Technologies Inc. prays for judgment against Defendant BETA Technologies, Inc. as follows:

A.     The Court enter judgment against BETA for breach of contract, misappropriation of trade secrets under federal and state law, declaratory judgment, and unfair and deceptive trade practices.

B.     Based on the irreparable damage for which Blue Force has no adequate remedy at law, entry of a preliminary injunction, to be effective throughout the pendency of this action, and a subsequent permanent injunction, enjoining BETA, its employees, agents, officers, directors, successors, and assigns, or others in privity therewith or under its control, and any and all persons acting by or under the authority of BETA or in privity with it:

> (1)     from using, distributing, publishing, and/or failing to protect Blue Force's Trade Secrets; and
>
> (2)     from otherwise unfairly competing with Blue Force.

C.     Entry of judgment ordering that products, molds, tooling, fabrications, design documents, plans, Trade Secret information and other items delivered to BETA under the breached contracts referenced herein be returned to Blue Force.

D.     Damages according to proof at trial for BETA's breach of the contracts in an amount no less than $259.1 Million ($259,100,000.00) in actual damages, plus significant consequential and incidental damages.

E.     Entry of judgment that the unfair or deceptive acts or practices of Defendant were

28

committed willfully or knowingly, and that Plaintiff be awarded up to three times its actual damages together with its costs and attorney's fees as a result of the same.

F.     Order granting pre- and post-judgment interest at the maximum rate allowed by law.

G.     Order awarding Blue Force full costs and attorney's fees as permitted by law.

H.     Order granting Blue Force any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims or issues so triable.


This the 27th day of July 2021.


Respectfully submitted,
*s/ K. Alan Parry*
K. Alan Parry
Email: kap@parryfirm.com
Parry Law, PLLC
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
T: 919-913-3320
F: 919-869-2600

-and-

*s/ Richard W. Bowerman*
Richard W. Bowerman (CT Bar # 04181)
Email: rbowerman@barclaydamon.com
Barclay Damon LLP
545 Long Wharf Drive, 9th Floor
New Haven, CT 06511
T: (203) 672-2668
F:  (203) 654-3275

29

## CERTIFICATE OF SERVICE

The undersigned hereby certify that the foregoing document was electronically filed using the Court's CM/ECF System, which will send notification to all counsel of record for the parties.

Dated: July 27, 2021

Respectfully submitted,
*s/ K. Alan Parry*
K. Alan Parry
Email: kap@parryfirm.com
Parry Law, PLLC
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
T: 919-913-3320
F: 919-869-2600

-and-

*s/ Richard W. Bowerman*
Richard W. Bowerman (CT Bar # 04181)
Email: rbowerman@barclaydamon.com
Barclay Damon LLP
545 Long Wharf Drive, 9th Floor
New Haven, CT 06511
T: (203) 672-2668
F: (203) 654-3275

30

# EXHIBIT A

# Manufacturing Agreement

THIS AGREEMENT (the "Agreement") is made as of the 11th day of October 2017, by and between Blue Force Technologies, Inc., (hereinafter "BFT"), incorporated under the laws of the State of Delaware, with a business address at 627 Distribution Drive, Suite D, Morrisville, NC 27560, and BETA Air, LLC, (hereinafter "BETA"), incorporated under the laws of the State of Delaware, with a business address at 265 Aviation Avenue, Suite 201, Burlington VT 05403 (collectively, the "Parties").

WHEREAS BETA possesses expertise in electric aircraft propulsion systems, and whereas BETA has conceived of a novel aircraft configuration ("Ava") upon which to demonstrate their electric propulsion; and

WHEREAS BFT possesses expertise in aircraft structural design, and BFT is capable of building certain structural components (the "Outriggers") for Ava;

NOW THEREFORE BE IT RESOLVED, in consideration of the mutual covenants, promises, warranties and other good and valuable consideration set forth herein, the Parties agree as follows:

1. <u>BETA Responsibilities</u>.  BETA shall provide BFT with the complete technical requirements for the Outriggers.  These requirements include, but are not limited to, all structural loads, physical interfaces and operating environments.

2. <u>BFT Responsibilities</u>.  BFT shall design, analyze, and build the Outriggers to the requirements of Paragraph 1 above.  BFT shall have no responsibility to independently validate the requirements from Paragraph 1. BFT shall deliver the completed Outriggers to BETA for ground static testing.  Under such ground static testing, all appropriate measures will be taken to ensure that no persons are at risk due to structural failure of the Outrigger.  BFT may provide advice on ground static testing, however, BETA shall have sole responsibility for determining the method and apparatus required to perform ground static testing.

3. <u>Payment</u>.  Following the satisfactory completion of ground testing, BETA shall accept and pay for the Outriggers in accordance with the terms of a commercial purchase order agreed upon by the parties.

4. <u>Pre-Flight Testing</u>.  Upon acceptance of the Outriggers, and prior to flight testing on the Ava vehicle, BETA further agrees to add BFT as a named insured on relevant BETA insurance policies, including, but not limited to, prototype flight test insurance.

5. <u>Indemnification and Insurance Related to Use of Outriggers.</u>  BETA shall defend, indemnify and hold BFT, its officers, officials, employees and consultants harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the performance of this Agreement. This hold harmless clause has been mutually negotiated and agreed to by the parties. The provisions of this Paragraph 5 shall survive the expiration or termination of this Agreement. In the event that any insurance policy is cancelled, or unable to be obtained, or insurance is otherwise not in force, BETA shall immediately notify BFT in writing and shall cease use of the Outriggers.  If requested by BFT, BETA will return the Outriggers to BFT at no cost until such time as appropriate insurance is implemented to resume testing.

5. <u>Term</u>. This Agreement shall remain in full force and effect for three (3) years after the Outriggers are used in test. At any time, this Agreement may also be terminated by mutual written consent of the Parties, provided that BETA first returns the Outriggers to BFT for disposal.

6. <u>Confidentiality</u>. Any information pertaining to either Party's business to which the other Party is exposed as a result of the relationship contemplated by this Agreement shall be considered to be "Confidential Information." Neither Party may disclose any Confidential Information to any person or entity, except as required by law, without the express written consent of the affected Party.

7. <u>Assignment</u>. Neither Party may assign or transfer their respective rights or obligations under this Agreement without prior written consent from the other Party.

8. <u>Governing Law and Dispute Resolution</u>. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of North Carolina, without regard to conflicts of laws rules.

9. <u>Severability</u>. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

10. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties, and supersedes any prior understanding or representation of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.

**Blue Force Technologies, Inc.**          **BETA Air, LLC**

_____          _____
Signature                                 Signature

Scott Bledsoe                             Kyle Clark
_____          _____
Print Name                                Print Name

President                                 President
_____          _____
Title                                     Title

# EXHIBIT B

# Teaming Agreement

This Teaming Agreement is made between Blue Force Technologies, Inc. ("BFT"), having a place of business at 627 Distribution Drive, Suite D, Morrisville, NC 27560, and Beta Technologies LLC ("Beta"), having a place of business at 265 Aviation Ave, Burlington VT 05403.

WHEREAS BFT identified and developed a relationship with a Customer, United Therapeutics ("UT"), and UT seeks to develop an electric VTOL aircraft (the "Opportunity"); and

WHEREAS BFT possesses a unique ability to design and build aircraft structure in a rapid, technically-proficient, cost-effective manner; and

WHEREAS Beta has also, subsequent to introduction by BFT, developed a significant business relationship with UT; and

WHEREAS Beta is currently in work on an early technology demonstration aircraft for UT ("Ava"); and

WHERAS Beta possesses unique skills and knowledge in the design, control, and propulsion of VTOL aircraft;

THEREFORE, the parties agree to the following:

- Beta shall pursue the Opportunity with the intention of being selected by the Customer as Prime Contractor leading the aircraft development and production activity for UT or Dr. Martine Rothblatt.
- Except for the pre-existing Ava aircraft project, Beta shall grant BFT the right of first refusal to be a subcontractor to Beta on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structure for programs where UT or Dr. Martine Rothblatt is the customer. BFT shall propose such work under commercial rates consistent with what other customers have received in the preceding year. Beta shall not solicit proposals from other structures providers while making a good faith effort to come to terms with BFT. Both parties recognize that the Customer often encourages unconventional contract terms.
- For inventions conceived of by BFT while under contract, BETA shall grant BFT non-exclusive intellectual property rights in all fields of use not granted to UT. Current fields of use granted to UT include Medical (including organ and tissue delivery).
- BFT shall support the Ava effort, by providing, at no charge, the following:
  - Three (3) Outriggers suitable for flight on Ava, as described in the BFT-Beta Manufacturing Agreement executed by the parties October 11, 2017.
  - One (1) Nose Fairing.
  - Introduction to flight test professionals.

[ continued next page ]

DocuSign Envelope ID: 1F9294F8-1BC8-48B6-8031-D57E96D47E4B

# Teaming Agreement

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have signed this Agreement as of the date below.

**Blue Force Technologies, Inc.**

Scott Bledsoe
President

Date: 1/16/2018

**Beta Technologies LLC**

Kyle Clark
CEO

Date: 1/16/2018

# EXHIBIT C

.

# ALIA Structures Design, Development and Manufacture
# Phase I – Prototype Vehicle

### FIRM FIXED PRICE CONTRACT

| Revision | Description | Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**PROPRIETARY INFORMATION** – This document contains data proprietary to BETA Technologies Inc. and Blue Force Technologies, Inc., This draft contract is provided for the recipient only. No other use is permitted without written authorization.

BETA and BFT PROPRIETARY

BETA  BFT

# Contents

1. Purpose ..................................................................................................................................... 3

2. Summary ................................................................................................................................... 3

3. Scope of Work and Plan ........................................................................................................... 5

   3.1    Deliverable Milestones ...................................................................................................... 5

   3.2    Key Performance Parameters (KPPs) ................................................................................ 9

   3.3    Firm Fixed Price Partial Payment Schedule ................................................................... 10

   3.4    US Government / Federal Sales ....................................................................................... 11

   3.5    Intellectual Property ....................................................................................................... 13

4. Other Terms and Conditions ................................................................................................. 14

Appendix A: Teaming Agreement ................................................................................................ 19

Appendix B: Payment Schedule ................................................................................................... 21

Appendix C: Phase I Prototype Program Schedule ...................................................................... 22

BETA    BFT

# 1. Purpose

Blue Force Technologies, Inc. (BFT or Contractor) and BETA Technologies Inc (BETA) agree that the purpose of this contract is for BFT to participate in the development of all structural elements for an electrically-powered VTOL aircraft. The VTOL aircraft is optionally-piloted, fully automated preflight, fully automated emergency landing, fully autonomous with a payload of 600 pounds allocated amongst pilot, organ care technician and organ care systems, that has a 200 nm range (zero wind) plus FAA required reserve range under IFR conditions, a one-hour recharging time, a best-in-class safety profile, utility in light icing conditions and a parts and systems maintenance and replacement lifetime better than turbine helicopters. This aircraft will be designed with the intent to be manufactured by BETA and its partners with the intent of structure to be manufactured by BFT or in a facility supported by BFT and its technologies. The goal of the aircraft program is to initially produce sixty (60) aircraft by 2028 for United Therapeutics (UT) and a similar number for other markets (the "ALIA program"). This contract does not include the delivery of structures or design work for conforming aircraft for certification or commercial production aircraft.

BETA shall continue to grant BFT the right of first refusal to be the exclusive supplier to BETA on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structures for projects for, or an aircraft substantially similar to, the ALIA configuration from UT, UT affiliates, or Dr. Martine Rothblatt. BFT shall propose such work under commercial rates consistent with what other customers have received in the preceding year. BETA shall not solicit proposals from other structures providers while making a good faith effort to come to terms with BFT. This Agreement supersedes the Teaming Agreement presented in Appendix A.

BFT understands that BETA lacks expertise in structural design, tooling, and manufacturing, and will therefore be relying on BFT to make technical and programmatic decisions to support the program milestones and technical objectives. BFT agrees that the overall success of the program and continuance of the contract will be subject to UT's assessment of quarterly progress toward annual goals which are set to enable UT to achieve its organ distribution goals. BFT understands that if progress is not achieved as outlined in the milestones, independent of BFT's fault, contribution or lack thereof, the contract may be terminated by UT.

# 2. Summary

This document sets forth a Firm Fixed Price (FFP) contract from BETA to BFT in support of the first phase (Phase 1) of the ALIA program. The preliminary ALIA configuration is presented in Figure 1, Figure 2 and Figure 3, and this contract is based on building all composite parts including the wing, fuselage, booms, tail and landing gear structure to support a vehicle substantially similar to what is depicted in Figure 1.

The ALIA program will have four phases that may be overlapped to the extent necessary to complete all four phases on schedule.

BETA and BFT PROPRIETARY



BETA / BFT

Phase 1: Proof of Concept (PoC) ALIA-250 Aircraft - commences with a system specification and concludes with a successful demonstration of 250nm range of an all-electric, vertical takeoff and landing aircraft.

Phase 2: Conforming Aircraft/Production Vehicle (PV) - begins with a design phase, includes a certification plan, basis and overall aircraft design, build and test.

Phase 3: FAA Type Certification - begins after the certification basis is issued by the FAA and the implementation phase is started. Concludes with FAA Type Certification.

Phase 4: FAA Production Certification - begins with production sourcing, design and planning which overlaps with the earlier phases and concludes with FAA Production Certificate issuance.

The first phase encompasses a period of performance from 01-Aug-2018 through 31-March-2020. This phase is a rapid development of a prototype aircraft and demonstration of key performance parameters in a flight test program. BFT's role is to design, develop and build the airframe structure, to include the landing gear attachment structure, and provide limited support of the integration of the aircraft. Success in the initial phase of the program will result in a subsequent contract offer for rights of first refusal from BETA to BFT for Phase 2.



*Figure 1: Preliminary Conceptual Rendering of the ALIA Vehicle (Left View).*



*Figure 2: Preliminary Conceptual Rendering of the ALIA Vehicle (Rear View).*



BETA / BFT



*Figure 3: Preliminary Conceptual Rendering of the ALIA Vehicle (Top View).*

This contract is derived from the Teaming Agreement between BFT and BETA dated 16-January-2018 as presented in Appendix A.

In this effort BFT shall design and build all structures and tooling for the ALIA aircraft using BFT "soft tooling" techniques. "Soft tooling" means molds and fixtures that are made from low-cost materials such as industrial foam and are generally suitable for one vehicle build. If it is determined by BETA that "hard tooling" is required for some aspect of the program, the cost and schedule impact shall be addressed as a change of scope and cost and accounted as a change order and scope increase. "Hard tooling" means molds and fixtures that are made from carbon-epoxy, aluminum, or similar durable materials that are suitable for producing multiple vehicles. If it is determined by BFT that components proposed to be made from soft tooling cannot be made, BFT shall use an appropriate fabrication method of its choice at no additional cost to BETA.

# 3. Scope of Work and Plan

BFT agrees to execute the preliminary schedule as presented in Appendix C (the "Schedule"). BFT agrees to refine and support the development of a program plan which may result in some modifications to the Schedule. All changes to the Schedule must be mutually agreed to and codified in writing before taking effect.

## 3.1    Deliverable Milestones



Summary quarterly and annual progress reports or product demonstrations shall be delivered in the Contractor's standard format at the end of each calendar quarter. Along with these written reports or demonstrations, Contractor shall support on-site visits from BETA and affiliates upon request. Subsystem and system operational demonstrations shall be provided in accordance with Contractor's major accomplishments as well as in accordance with the Annual Milestones as listed below.

Quarterly progress reports shall include design reviews, test plans, drawings, work instructions and test reports aimed at demonstrating progress towards meeting the deliverables or the Key Performance Parameters for Phase I as appropriate.

The following milestones shall be delivered to BETA in a format to support the quarterly milestone by the close of the quarter noted. It is generally desired to have a minimum of a quarterly in-person presentation, meeting or demonstrations to deliver the milestone, but not required.

Table 1 presents the quarterly milestones defined by BETA for BFT to achieve the Schedule. These milestones will be achieved by BFT to enable BETA to receive its progress payments from its program sponsor(s).

*Table 1: Summary of BFT quarterly milestones and contract deliverables.*

| Date | Description | Deliverables |
|---|---|---|
| 28-Sep-2018 | Quarter 1 Key Deliverables<br>Conceptual Design Review | Structural and MFG concept<br>Identify key load cases and estimates<br>Initial FEM to support key member sizing<br>Empty weight fraction study<br>Program plan inputs<br>Conceptual Design Review support |
| 21-Dec-2018 | Quarter 2 Key Deliverables<br>Preliminary Design Review | Structural layout and bill of materials<br>Interim Design Review support<br>FEM static and dynamic results<br>Coupon testing<br>Risk reduction articles<br>OML tooling design & review<br>Preliminary Design Review support |
| 29-Mar-2019 | Quarter 3 Key Deliverables<br>Critical Design Review | Updated / Final layout<br>Detailed CAD and drawings<br>Interim Design Review support<br>FEM static, dynamic and flutter results<br>Test plans for proof load and ground vibration<br>OML tooling build<br>Large internal part tooling design<br>Critical Design Review support |
| 28-Jun-2019 | Quarter 4 Key Deliverables<br>Partial Vehicle Structural Fabrication | All tooling design and build complete<br>Fixturing complete<br>Boom and tail assembly fabrication |
| 30-Sep-2019 | Quarter 5 Key Deliverables | Fuselage assembly fabrication |



BETA / BFT

| | Initial Vehicle Integration | Miscellaneous part fabrication<br>Ship all parts to BETA<br>- Booms<br>- Wing and fairings<br>- Landing Gear Support Structure<br>- Fuselage, doors and windows<br>- Struts, tail and controls surfaces<br>EPPS installation in boom support<br>Airframe assembly and integration support |
| 20-Dec-2019 | Quarter 6 Key Deliverables<br>Test Readiness Review | Final FEM updates and margin validation<br>Airworthiness support<br>Airworthiness Review support |
| 29-Mar-2020 | Quarter 7 Key Deliverables<br>Integration Support | Test and measurement support |

Table 2 presents near term critical milestones that BETA must meet for BFT to achieve the Schedule. Any deviation from these dates shall be considered a Schedule modification which may incur cost to BETA. Deviations are only acceptable when mutually agreed to in writing in advance by BFT and BETA.

*Table 2: Critical data, information and due dates to be provided by BETA or other subcontractors to BFT.*

| Date | Deliverable | Description |
|------|-------------|-------------|
| 15-Aug-2018 | Baseline information | Latest OML data available.<br>Agreement on the design origin for all CAD and drawings.<br>Final agreement on CAD and data sharing approach.<br>Weights, volumes, hard points, and CG of all systems that are already modeled. |
| 05-Sep-2018 | Preliminary air flow cooling inlets and sizing. | Large cutouts in booms for cooling inverters, motors, etc. using downwash, cutouts and ducts in fuse for main batteries, cutouts and ducts for pusher motor are a major risk area to the structures. |
| 05-Sep-2018 | Prototype load requirements. | Need development and agreement on loads requirements for prototype. Preliminary inertial and ROM flight envelope load cases agreed to (from Part 23 and 27). |
| 10-Sep-2018 | Door and window locations and sizes. | Preliminary data due to impact on load paths. |
| 10-Sep-2018 | Maximum propeller deflection. | Maximum VTOL prop deflection to layout booms. |
| 15-Sep-2018 | Flight control surfaces locations and sizes. | These force wing and tail layouts, including spars and main structural components. Has significant impact on sizing. |



| | | |
|---|---|---|
| 20-Sep-2018 | System definitions must be locked down in step with the structure. | Critical for balancing CG and empty weight analysis early and must include batteries, propellers, motors and support equipment, and gearboxes. Early schedule to use typical iterative design methodologies. 1. Break each system down into subcomponents with ROM weights. This data may be nearly complete based on content of consolidation slides. 2. Model ROM locations in AC with simple volume (i.e., cylinders, boxes, line runs for mech FCs and electrical, avionics, wiring, fire systems, environmental controls 3. Complete an initial layout and analyze structure with these to avoid major redesign 4. Iterate on each so they are CDR ready at same time as structure Failure to achieve this presents risk to force entire redesigns of structure to accommodate subsystems. Major risk areas include systems in booms (inverters, motors, wiring, busing, others), tail config FCs, mech FC's, batteries and electrical requirements. |
| 20-Sep-2018 | System weight allocations locked and at PDR level. | This runs in parallel with the task above. It is critical to set a min/max range for everything early to balance CG. Same emphasis on getting each system responsible POC going now on development. |
| 05-Oct-2018 | Landing gear configuration and layout at PDR level. | Need reactionary frames and bulkheads incorporated early as they highly affect fuselage layout. |
| 15-Oct-2018 | Battery attachment concept to fuselage and any other areas. | Critical to designing attachment structure and reacting through structure. This is one of the main sizing constraints. This needs to include cable/power bus ingress/egress and keep out areas. |
| 25-Oct-2018 | PDR level load agreement/requirements locked. | Suggest splitting development into prototype with limited load sets and production model, in the future, which may require load analysis from both Part 23 and Part 27. Inertial load cases (i.e., hard landing, crash) Survivability load cases requirements including hard landing cases, gust case sizing, asymmetric loads (i.e., one lift prop failure) |

BETA and BFT PROPRIETARY



BETA    BFT

| | | Suggest considering typical Part 23 flight envelope load cases to develop max dive, pullup and maneuver. Establish responsible POC on taking Part 23 and Part 27 to outline each load case with rational on what to use from each. Begin gap analysis early so we can speak to load cases we might design flight test regime around for prototype. |
|---|---|---|
| 25-Oct-2018 | Door and window locations and sizes. | PDR level. |
| | | |
| 25-Oct-2018 | Battery and electrical shielding for structures defined. | All requirements on structure for shielding that is integrated into the structure. Must include, but not limited to, fire protection, grounding, busing runs and shielding. |
| 05-Nov-2018 | Final air flow cooling inlets and sizing locked. | Large cutouts in booms for cooling inverters, motors, etc. using downwash, cutouts and ducts in fuse for main batteries, cutouts and ducts for pusher motor are a major risk area to the structures. |
| 05-Nov-2018 | Thermal loads due to battery and motor temperatures. | Requirements for battery and motor temps at high temps to determine effect on structure. Initial thermal analysis date to support final material selection. Causes a reduction in structural strength as temp increases. May need to look at titanium, steels, or high temp comp in critical areas. |

| DEVELOPMENT ASSUMPTIONS |
|---|
| 1. Structures will not include cabin furnishing for the prototype. As described above the location of the weight being carried, seat mounts and weights/structures to be provided no later than 20-Sep-2018. |
| 2. Cockpit layout and human factors is not included scope by BFT. |
| 3. Any payloads and attachment points must be included in the system data no later than 20-Sep-2018. |
| 4. BFT has assumed all infused or wet layup structure for this vehicle build. Major deviations that are requested by BETA may result in cost accumulated in the change order. |
| 5. Firewall requirements are unknown at the time of quote, therefore no firewall structure is included in this contract. |

## 3.2   Key Performance Parameters (KPPs)

BETA and BFT PROPRIETARY



A list of three (3) key performance parameters for the ALIA program is provided below. BFT will support BETA in addressing each of these in the PDR and CDR phases of this contract and will demonstrate that these performance parameters have been met during the testing phases as appropriate.

Phase 1 KPPs

KPP 1: The ALIA 250 shall have a cruise speed greater than or equal to 100 knots.

KPP 2a: The ALIA 250 shall demonstrate a zero wind, no reserve range of 250nm with VTOL at both ends safely.

KPP 5a: The ALIA 250 shall be capable of fully recharging after an operational range mission 200 nm in less than one hour when connected to a fully functional RP subsystem.

## 3.3  Firm Fixed Price Partial Payment Schedule

BFT will supply BETA with three (3) annual invoices that will include all of the monthly partial payments that shall be paid net 15 days from the last day of each month during the POC phase of this effort. The Schedule in Appendix C requires the following payments to achieve the Schedule. BFT shall supply BETA an invoice for all amounts due in the final payment no later than 20 days after the final partial payment in Table 3.

Table 3 presents the partial payment amount and due date.

*Table 3: Partial Payment Schedule for POC Vehicle Phase.*

| Date | Amount |
|------|--------|
| 31-Aug-2018 | $60,000 |
| 30-Sep-2018 | $60,000 |
| 31-Oct-2018 | $125,000 |
| 30-Nov-2018 | $200,000 |
| 31-Dec-2018 | $200,000 |
| 31-Jan-2019 | $275,000 |
| 28-Feb-2019 | $275,000 |
| 31-Mar-2019 | $260,000 |
| 30-Apr-2019 | $225,000 |
| 31-May-2019 | $225,000 |
| 30-Jun-2019 | $225,000 |
| 31-Jul-2019 | $225,000 |
| 30-Aug-2019 | $210,000 |
| 30-Sep-2019 | $200,000 |
| 31-Oct-2019 | $100,000 |
| 30-Nov-2019 | $80,000 |
| 31-Dec-2019 | $20,000 |
| 31-Jan-2020 | $15,000 |
| 28-Feb-2020 | $10,000 |

BETA and BFT PROPRIETARY


BETA    BFT

| 31-Mar-2020 | $10,000 |
|---|---|
| 30-Apr-2020 | Payment in full of all outstanding invoices and balance of Management Reserve, if applicable. |

The total value of this contract shall not exceed $3,400,000. The contract shall include $3,000,000 in partial payments as presented in Table 3 and Management Reserve limited to $400,000 in total.

Management Reserve addresses unforeseen changes which are solely within the control of BFT and execution errors. It is not intended to address changes in the basic aircraft configuration or scope of work requested by BETA. The scope of this contract does not include any spare parts.   Use of Management Reserve for the aforementioned purposes must be by mutual agreement in writing prior to Management Reserve charges exceeding $50,000 in a single month. BFT agrees to itemize any accrued Management Reserve charges monthly, with payment due at the end of this contract. Any unused Management Reserve will not be invoiced by BFT.

Title to all structure and tooling built, or otherwise provided by BFT, regardless of physical location, whether delivered or undelivered, remains with BFT until all invoices are paid in full, inclusive of all partial payments indicated above and any amount invoiced against the Management Reserve.  At such time, BFT will promptly provide a written transfer of title to BETA and BETA will determine the disposition of all tooling and structure. Either party reserves the right to file routine public notice regarding this claim under the Uniform Commercial Code.

Change orders and/or scope increases not covered by the Management Reserve may be requested in writing by BETA.  Change orders and scope increases shall be by mutual written agreement of BETA and BFT before being effective. Each change order shall require a contract modification that includes cost increase, ceiling increase and schedule definition.

Any payment past due more than 5 calendar days will be assessed a 4% late payment fee if paid within 30 calendar days of the due date. Any payments past due more than 30 calendar days will accrue interest on the late payment at 8% APR, in addition to the 4% late payment fee, until paid in full.

BFT has the right to terminate this contract when any payment is past due more than 45 calendar days. If BFT terminates the contract due to late payment when all BFT deliverables due at the time of delinquency have been met, BETA shall immediately pay all past due amounts, and the next 30 calendar days pro rata partial payment on the date of termination as the final payment.  The delinquency date is considered the original due date of the payment. In the event of termination for late payment, any outstanding invoices against the Management Reserve shall be paid in full.

## 3.4    US Government / Federal Sales

BFT shall have the non-exclusive right to perform marketing, business development, and act as prime contractor in sales to the US Government for non-production research and development activities,

BETA / BFT

utilizing assets developed hereunder. BETA and BFT agree that each shall receive the right of first refusal on all design, development, research, and sales opportunities developed by the other party in its area of expertise. BETA and BFT agree that business development activities shall be deconflicted to avoid BETA and BFT from competing with one another on common opportunities. BETA and BFT agree to disclose to the other party within 10 working days of identification of opportunities and / or organizations with whom which each party intends to develop business. The disclosure shall include the general scope of the opportunity, the potential customer, and the potential timeline for a contract. For the purposes of this clause, BETA shall have right of first refusal on all efforts not within BFT's area of expertise. BFT's area of expertise includes: structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structures. Neither party shall solicit proposals from other providers while making a good faith effort to come to terms.

Subject to renewal described below, BFT shall have the exclusive right to purchase, under commercial pricing and terms, production aircraft from BETA which will be subsequently offered for sale to the US Government ("Federal Sales") by BFT. Such Federal Sales aircraft may be modified by BFT for purposes which are specific to the US Government's needs, and BFT shall serve as prime contractor for any such modification contracts, with BETA having the right of first refusal to participate in modification work related to electric propulsion at its commercial rates. For the purposes of this clause, BFT's exclusive right terminates on the third anniversary of receipt of aircraft certification (the "Initial Period"). The exclusive right for Federal Sales automatically renews for a period of two additional years (the "Renewal Period") each time BFT meets the following criteria:

- Sales and/or delivery of QTY 5 certified aircraft during the Initial Period or the Renewal Period, as applicable, or,
- Pre-orders of QTY 5 aircraft before certification, or,
- Generation of $20,000,000 of research and development sales.

Pursuant to these rights, both parties agree not to withhold from the other party technical data required to generate sales.

BFT agrees to make a best effort to actively pursue suitable government sales opportunities, respond to BAA's and solicitations, pursue opportunities to educate the government agencies on eVTOL and ALIA, and at BFT's sole discretion, submit unsolicited proposals to the government.

All public disclosures for the purposes of marketing and business development will require written approval by BETA. All public disclosure of ALIA images, video, likeness or technical specifications are also subject to written approval by BETA. BETA agrees to approve marketing requests in a timely manner. Public disclosure shall mean disclosure to 30 or more people within 30 days. BETA agrees to obtain written permission from BFT prior to using its name or logo in any public disclosure. BFT agrees to not unreasonably withhold such approval.

BETA recognizes that BFT has unique expertise and specific processes and systems in place to service government sales and up-fit programs. In the event BFT elects not to actively pursue government sales

BETA and BFT PROPRIETARY



BETA   BFT

for a period of more than 6 months or fails to maintain necessary processes, BFT will notify BETA immediately and will immediately relinquish said exclusive rights to purchase aircraft from BETA for government sales.

The Parties agree to work in good faith to create and execute a commercial distribution agreement pertaining to the sale of ALIA aircraft to the US Federal Government and to ensure compliance with all Federal Acquisition Regulations.

## 3.5    Intellectual Property

A broad range of background intellectual property ("Background IP") that will be used for this effort is set forth in Table 4.  Each party owns – as indicated in Table 4 – and controls all of its Background IP as same exists on the date hereof.

*Table 4: Background IP.*

| Title | Description | Ownership |
|---|---|---|
| **Aircraft structural design** | Initial layout and detailed design of aircraft structure, both metallic and composite, for conventional and unconventional aircraft and spacecraft configurations.  Integration of metallic and composite design via bonded and / or mechanically fastened joint.  Design for prepreg, infusion, and filament wound structure. | BFT |
| **Aircraft structural analysis** | Hand analysis, spreadsheet-based analysis, and Finite Element Method (FEM) modeling of structures designed using the techniques listed above.  Mapping of CFD aero loads and distributed inertial loads to FEM mesh.  Processing combined load cases to produce enveloping strength plots.  Tailoring structure to meet stiffness requirements. | BFT |
| **Soft tooling** | Tooling suitable for low-use situations, with and without thermal compensation. | BFT |
| **Hard tooling** | Tooling suitable for production situations, with and without thermal compensation. | BFT |
| **Aircraft structure manufacturing** | Manufacturing of metallic and composite structure designed, analyzed, and tooled using the techniques listed above.  Manufacturing of structure suitable for one-off demonstrators, as well as low-volume and high-volume production techniques.  Extensive knowledge on how to gain certification for a variety of large and small aerospace customers, as well as FAA cert basis for MTM45-1 materials. | BFT |
| **Aircraft structure test** | Tests types to evaluate strength, stiffness, and modal frequencies for metallic and composite structure.  Comparison of test data to FEM. | BFT |
| **Configuration design** | Multi-disciplinary knowledge in aerodynamics, stability and control, propulsion integration, flying qualities, and overarching certification requirements that have been | BFT |

BETA and BFT PROPRIETARY



BETA / BFT

| | gleaned from participation in a variety of unconventional aircraft and spacecraft programs. | |
|---|---|---|
| Rapid surge production technologies | Manufacturing and production technologies for rapid surge aircraft rate production. | BFT |

BETA shall own and control all intellectual property generated by BFT in the performance of this contract under the "work made for hire" doctrine. It shall likewise own all deliverables, data and results of the services rendered by BFT. During the course of its performance hereunder, BFT shall promptly disclose to BETA all patentable and unpatentable inventions, discoveries and ideas which are made or conceived in whole or in part by or on behalf of BFT. Such disclosures shall include the deliverables, the materials and confidential information, and improvements, useful compositions, structural modifications or derivatives of materials and any new use for the materials.

Notwithstanding the foregoing, BETA grants the rights to BFT to own and control all Airframe manufacturing technologies and processes ("Airframe Mfg IP"). Airframe Mfg IP includes: (i) composite infusion, molding and layup processes and techniques; (ii) metal to composite joinery; (iii) design systems and tools for manufacturing composite and/or metallic structural parts; and (iv) thermoset resin molding and processes. Intellectual property that is not Airframe Mfg IP shall be considered "Design Specific Intellectual Property".

BFT shall grant to BETA an irrevocable, transferable, perpetual, non-exclusive, royalty-free, fully-paid license to Airframe Mfg IP and required BFT Background IP in the ALIA program.. In the event that BFT elects not to protect its Airframe Mfg IP either as trade secrets or via patent applications, as determined by BFT in its discretion, BFT shall provide reasonable notice to BETA before any loss of rights and BETA may seek such protection at its own expense.

BFT warrants that any person performing services hereunder on behalf of BFT is under a continuing obligation immediately to assign all rights and ownership developed in the course of such person's provision of services, without regard to ultimate determination of inventorship or ownership as defined above.

BFT shall not, and shall cause its affiliates not to, directly or indirectly, jointly or in conjunction with any third party, whether as principal, agent, stockholder, employee, independent contractor or in any other manner whatsoever, design, assess, test, study, develop, engineer, manufacture, distribute market or sell any Competing Product made from or using intellectual property developed while performing under this contract. "Competing Product" shall mean the use of an electrically-powered VTOL aircraft for medical applications. This covenant shall run through January 1, 2028.

# 4. Other Terms and Conditions

The following additional terms and conditions apply to this contract:

BETA and BFT PROPRIETARY



**GENERAL:**

Each party and all of its affiliates shall indemnify and hold harmless the other party on all matters related to the execution of this contract.

Each party accepts that it cannot claim, use, reveal, disclose or sell the other party's background IP as defined above, without written consent of the other party.

Neither party shall offer to employ, contract with, solicit employment, offer employment, or induce any of the other party's employees or consultants to leave their current employer for at least 12 months after the termination of this contract.

BETA shall have the right to terminate this contract if the program misses four successive quarterly milestones. In the event BETA terminates the contract for failure to meet milestones, regardless of fault or lack of fault by BFT, BETA shall pay BFT the pro rata portion of the next 30 calendar day partial payment as defined in

Table 3, from the date of notice and any outstanding invoices against the Management Reserve.

BETA shall have the right to terminate the contract, for convenience, but shall be required to pay BFT the pro rata portion from the date of notice of the next 30-day partial payment due as defined in

Table 3 and any outstanding invoices against the Management Reserve or payment in full for all materials and services that cannot be cancelled, whichever is greater.

All changes to this contract shall be in writing and must be mutually agreed to by BFT and BETA in order to be effective.

The program plan shall be developed during the initial quarter of the program and must be mutually acceptable to BFT and BETA in order to be effective. Any changes to technology, major aircraft layout changes, or major impact on delivery dates that are in conflict with the Schedule shall be considered a change in scope of work or a program modification.

This contract shall be governed by Delaware law.

**INSURANCE:**

Required Basic Coverage. Both parties shall procure and maintain in effect during the term of this contract, and as otherwise provided, insurance coverage conforming to the minimum levels indicated below. The insurance shall be procured from insurance companies of recognized financial responsibility reasonably acceptable in the aviation industry. All policies shall be written on an occurrence basis.

> Worker's Compensation. Worker's Compensation Insurance with statutory benefits and limits, which shall fully comply with all statutory requirements. Such insurance shall include Employer's

Liability with limits of $1,000,000 for each accident, $1,000,000 for each disease, and $1,000,000 for each employee for disease.

Commercial General (Public) Liability Insurance. Commercial General Liability Insurance which shall include: Bodily Injury, Property Damage, Personal Injury, Blanket Contractual Liability, and Broad Form Property Damage with combined single limits of not less than $1,000,000 per occurrence. $2,000,000 general aggregate.

Automobile Liability Insurance. Automobile liability insurance, including Owned, Hired and Non-Owned Liability with a limit of no less than $1,000,000 for Bodily Injury and Property Damage.

Excess Liability Insurance. Excess Auto and Employers Liability Insurance with limits not less than $5,000,000.

Professional Liability Insurance. Professional Liability Insurance (including "errors and omissions" or equivalent) insurance in the amount of $5,000,000 per claim and $5,000,000 in the aggregate. Such insurance shall be maintained throughout the life of this Agreement and for a period of one year after final end date of this Agreement. Professional Liability shall be required if each party's' products and completed operations liability insurance policy does not include coverage for the design of Aviation Components and/or Aircraft.

Required Program Coverage. BETA shall procure and maintain in effect during the term of this contract, and as otherwise provided, insurance coverage conforming to the minimum levels indicated below or those levels required by UT or its affiliates. In the event that the insurance requirements by UT for this program are less than described below, BETA shall inform BFT of the level of coverage and provide endorsements to BFT.

Products and Completed Operations Insurance (Including Aviation Components and/or Aircraft). Products and completed operations insurance with a limit of no less than $5,000,000 per occurrence and in the aggregate. Such insurance shall be maintained during the term of this contract and for a period of one year thereafter.

Flight Test Insurance. Flight Test insurance with a limit of no less than $5,000,000 per occurrence and in the aggregate. Such insurance shall be maintained during the term of this contract and for a period of one year thereafter.

Required Endorsements. Each of the policies defined above under the "Required Program Coverage" section must be further endorsed to BFT as a named insured, exclusively related to efforts associated with the ALIA program.

Certificate of Insurance. At the inception of this contract, and from time to time at BFT's request, BETA shall provide one or more certificate(s) of insurance to BFT demonstrating compliance with the "Required Program Coverage" section. All such certificate(s) of insurance shall include the following language, or language to substantially the same effect: "Certificate Holder is included as Additional

BETA / BFT

Insured. Coverage indicated on this Certificate of Insured is provided on a primary and non-contributory basis. Waiver of subrogation is provided. Separation of insureds is provided."

<u>No Duty to Verify or Review.</u> No provision of this contract shall impose on the other party any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by the other party nor shall BFT be responsible for any representations or warranties made by or on behalf of BETA to any insurance company or underwriter. Any failure on the part of either party to pursue or obtain the evidence of insurance required by this contract from the other party and/or failure of either party to point out any non-compliance of such evidence of insurance shall not constitute a waiver of any of the insurance requirements in this contract.

## WARRANTY:

With the exception of the above, BETA and BFT acknowledge and agree that given the research and development nature of this contract there is no warranty by BFT to BETA of any kind, either expressed or implied, by fact or law.

BFT will execute this contract on a Best Efforts basis and shall advise BETA of any and all known quality, workmanship, fitness or airworthiness of material or data deliverables issues under this contract.

ACCORDINGLY, NEITHER BFT NOR ITS AFFILIATES MAKES, HAS MADE OR SHALL BE DEEMED TO MAKE OR HAVE MADE ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO ANY AIRCRAFT TO BE DEVELOPED HEREUNDER OR ANY ENGINE OR COMPONENT THEREOF INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, OR AIRWORTHINESS.

## ACCEPTANCE:

Blue Force Technologies, Inc.                                    BETA Technologies, Inc.

Scott Bledsoe                                                   Kyle Clark
President                                                       CEO

BETA and BFT PROPRIETARY                                        Page 17 of 23

Date: 10/1/2018

Date: 10/1/2018

BETA and BFT PROPRIETARY

_____ / _____
BETA      BFT

# Appendix A: Teaming Agreement

DocuSign Envelope ID: 1F9294F8-1BC8-46B6-8031-D57E96D47E4B

**Teaming Agreement**

This Teaming Agreement is made between Blue Force Technologies, Inc. ("BFT"), having a place of business at 627 Distribution Drive, Suite D, Morrisville, NC 27560, and Beta Technologies LLC ("Beta"), having a place of business at 265 Aviation Ave, Burlington VT 05403.

WHEREAS BFT identified and developed a relationship with a Customer, United Therapeutics ("UT"), and UT seeks to develop an electric VTOL aircraft (the "Opportunity"); and

WHEREAS BFT possesses a unique ability to design and build aircraft structure in a rapid, technically-proficient, cost-effective manner; and

WHEREAS Beta has also, subsequent to introduction by BFT, developed a significant business relationship with UT; and

WHEREAS Beta is currently in work on an early technology demonstration aircraft for UT ("Ava"); and

WHERAS Beta possesses unique skills and knowledge in the design, control, and propulsion of VTOL aircraft;

THEREFORE, the parties agree to the following:

- Beta shall pursue the Opportunity with the intention of being selected by the Customer as Prime Contractor leading the aircraft development and production activity for UT or Dr. Martine Rothblatt.
- Except for the pre-existing Ava aircraft project, Beta shall grant BFT the right of first refusal to be a subcontractor to Beta on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structure for programs where UT or Dr. Martine Rothblatt is the customer. BFT shall propose such work under commercial rates consistent with what other customers have received in the preceding year. Beta shall not solicit proposals from other structures providers while making a good faith effort to come to terms with BFT. Both parties recognize that the Customer often encourages unconventional contract terms.
- For inventions conceived of by BFT while under contract, BETA shall grant BFT non-exclusive intellectual property rights in all fields of use not granted to UT. Current fields of use granted to UT include Medical (including organ and tissue delivery).
- BFT shall support the Ava effort, by providing, at no charge, the following:
  - Three (3) Outriggers suitable for flight on Ava, as described in the BFT-Beta Manufacturing Agreement executed by the parties October 11, 2017.
  - One (1) Nose Fairing.
  - Introduction to flight test professionals.

[ continued next page ]

BETA    BFT

DocuSign Envelope ID: 1F9294F8-1BC8-48B6-8031-D57E96D47E4B

## Teaming Agreement

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have signed this Agreement as of the date below.

**Blue Force Technologies, Inc.**

Scott Bledsoe

Scott Bledsoe
President

Date: 1/16/2018

**Beta Technologies LLC**

Kyle Clark
CEO

Date: 1/16/2018

# Appendix B:  Payment Schedule



Figure 4: Program Spend Plan for Soft Tooling Approach.

## Appendix C:  Phase I Prototype Program Schedule

The following schedule data is provided for guidance purposes until a detailed and mutually agreed program plan can be completed.



BETA and BFT PROPRIETARY

BETA / BFT



| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 71 | Detailed FEM model updates | 4 wks | Tue 4/9/19 | Mon 5/6/19 |
| 72 | FEM - static analysis | 2 wks | Tue 2/26/19 | Mon 3/11/19 |
| 73 | FEM - dynamic analysis | 2 wks | Tue 3/19/19 | Mon 4/1/19 |
| 74 | FEM - flutter model | 2 wks | Tue 4/2/19 | Mon 4/15/19 |
| 75 | Flutter analysis | 2 wks | Tue 4/16/19 | Mon 4/29/19 |
| 76 | Proof load test plan | 1 wk | Tue 3/19/19 | Mon 3/25/19 |
| 77 | GVT plan | 1 wk | Tue 4/16/19 | Mon 4/22/19 |
| 78 | CDR | 0 days | Mon 5/6/19 | Mon 5/6/19 |
| 79 | Close CDR actions | 1 wk | Tue 5/7/19 | Mon 5/13/19 |
| 80 | Tooling | 170 days | Thu 11/8/18 | Tue 7/23/19 |
| 81 | Tranche 1 (OML) tooling design | 4 wks | Thu 11/8/18 | Fri 12/7/18 |
| 82 | Tranche 1 (OML) tooling review | 0 days | Fri 12/7/18 | Fri 12/7/18 |
| 83 | Tranche 1 (OML) tooling build | 10 wks | Mon 12/10/18 | Mon 2/25/19 |
| 84 | Tranche 2 (large internal parts) tooling design | 4 wks | Tue 2/19/19 | Mon 3/18/19 |
| 85 | Tranche 2 (large internal parts) tooling review | 0 days | Mon 3/18/19 | Mon 3/18/19 |
| 86 | Tranche 2 (large internal parts) tooling build | 6 wks | Tue 3/19/19 | Mon 4/29/19 |
| 87 | Tranche 3 (small internal parts) tooling design | 4 wks | Tue 5/7/19 | Tue 6/4/19 |
| 88 | Tranche 3 (small internal parts) tooling review | 0 wks | Tue 6/4/19 | Tue 6/4/19 |
| 89 | Tranche 3 (small internal parts) tooling build | 8 wks | Wed 6/5/19 | Tue 7/23/19 |
| 90 | Misc tools / fixtures | 4 wks | Wed 6/5/19 | Tue 7/9/19 |
| 91 | Vehicle Structural Fabrication | 95 days | Tue 5/7/19 | Wed 9/25/19 |
| 92 | [illegible] | 10 wks | Wed 7/17/19 | Wed 9/25/19 |
| 93 | Ship Wing Assy | 0 days | Wed 9/25/19 | Wed 9/25/19 |
| 94 | Boom fabrication | 12 wks | Tue 5/7/19 | Tue 8/6/19 |
| 95 | Ship Boom & Tail Assy | 0 days | Tue 8/6/19 | Tue 8/6/19 |
| 96 | Fuselage Assy fabrication | 8 wks | Wed 7/10/19 | Wed 9/4/19 |
| 97 | Ship Fuselage Assy | 0 days | Wed 9/4/19 | Wed 9/4/19 |
| 98 | Misc Parts fabrication | 4 wks | Wed 8/7/19 | Wed 9/4/19 |
| 99 | Ship parts | 0 days | Wed 9/4/19 | Wed 9/4/19 |
| 100 | Vehicle Integration Support | 140 days | Thu 9/5/19 | Mon 3/30/20 |
| 101 | Support EPPS installation in Boom | 3 wks | Thu 9/5/19 | Wed 9/25/19 |
| 102 | Support Boom to Wing mate | 3 wks | Thu 9/26/19 | Wed 10/16/19 |
| 103 | Support Wing to Fuse mate | 2 wks | Thu 10/17/19 | Wed 10/30/19 |
| 104 | Support control runs and other systems | 4 wks | Thu 10/31/19 | Wed 11/27/19 |
| 105 | Update FEM and re-run margins | 3 wks | Mon 12/2/19 | Fri 12/20/19 |
| 106 | Air Worthiness Support | 1 wk | Mon 12/30/19 | Mon 1/6/20 |
| 107 | Air Worthiness Review | 0 days | Mon 1/6/20 | Mon 1/6/20 |
| 108 | Integration Support | 12 wks | Tue 1/7/20 | Mon 3/30/20 |
| 109 | | | | |
| 110 | FFP Management Reserve | 0 days | Mon 7/8/19 | Mon 7/8/19 |

Project: BFT Ten Year Plan v01 -
Date: Mon 8/20/18

Task; Split; Milestone; Summary; Project Summary; Inactive Task; Inactive Milestone; Inactive Summary; Manual Task; Duration-only; Manual Summary Rollup; Manual Summary; Start-only; Finish-only; External Tasks; External Milestone; Deadline; Progress; Manual Progress

Page 2

BETA / BFT

# EXHIBIT D



# ALIA-250 Production Forecast

## Current and Projected Demand:

| Customer Vertical | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|
| Organ Transportation | 0 | 0 | 5 | 20 | 40 | 40 | 80 | 80 | 100 | 100 |
| Cargo and Logistics *(with options)* | 0 | 0 | 0 | 17 | 42 | 83 | 83 | 85 | 85 | 85 |
| U.S. Government *(with options)* | 0 | 0 | 30 | 50 | 90 | 110 | 110 | 145 | 145 | 170 |
| Passenger | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 175 | 550 | 600 |
| Total | 0 | 0 | 35 | 87 | 172 | 233 | 298 | 485 | 880 | 955 |

*\*Deliveries will be made 18 months following the placement of an order*

## Delivery Profile by Customer Vertical:



## Notes:
- Initial production facility will support throughput of 300 aircraft per year beginning with the first delivery in 2023, subsequent capacity will be required by 2028
- Government and cargo variants of the aircraft will utilize the swing-nose structure while the passenger and organ transplant aircraft will be delivered with one side door for loading
- Optional deliveries are contingent upon delivery of an automated platform that is deployable in the logistics space and government verticals
- Demand in the passenger vertical is representative of projections in the growth and uptake of eVTOL technology in the ride sharing and civilian urban air mobility system