# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:21-cv-422-CCE-JLW

| | | |
|---|---|---|
| BLUE FORCE TECHNOLOGIES INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | **BETA TECHNOLOGIES, INC.'S** |
| | ) | **MOTION FOR PARTIAL** |
| v. | ) | **SUMMARY JUDGMENT** |
| | ) | **(Fed. R. Civ. P. 56)** |
| BETA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

## INTRODUCTION

Defendant and Counterclaim Plaintiff BETA Technologies, Inc. ("BETA") and Plaintiff and Counterclaim Defendant Blue Force Technologies Inc. ("Blue Force") were parties to the ALIA Structures Design, Development and Manufacture Phase I – Prototype Vehicle (the "ALIA Phase I Contract"). The ALIA Phase I Contract gave BETA "the right to terminate the contract, ***for convenience***" (emphasis added), subject to making certain wind-down payments after the termination. It is undisputed that on May 7, 2021, BETA's CEO informed Blue Force's CEO in writing that BETA was terminating the contract effective June 6, 2021. It is also undisputed that BETA has made all payments due to Blue Force under the contract.

Accordingly, BETA now moves for summary judgment on its request for declaratory relief establishing that (1) BETA was entitled to terminate the ALIA Phase I Contract for convenience; (2) BETA did in fact terminate the ALIA Phase I Contract for convenience effective June 6, 2021; and (3) as a result of that termination, Blue Force has

no further right of first refusal or any other expectation of special treatment by BETA in connection with the ALIA Phase I Contract or ALIA program. BETA also moves for summary judgment on Blue Force's breach of contract claim alleging that BETA wrongfully terminated or wrongfully attempted to terminate the ALIA Phase I Contract.[1]

## RELEVANT FACTS

### I.    The ALIA Phase I Contract.

BETA is the inventor of unique, renewable electric aviation propulsion technologies and is in the business of developing and manufacturing electrically powered vertical take-off and landing ("eVTOL") aircraft. (D.E. 32 ¶ 2; Clark Decl. (D.E. 15-1) ¶ 5.) Its electric propulsion technology holds the promise of globally transforming the aerospace industry as we know it, creating a renewable and green future, and BETA, with the backing of prominent investors and some of the world's most successful companies, is in an urgent race to achieve this goal. BETA's promise was prominently featured in the *New York Times* just last month. (Ben Ryder Howe, *The Battery that Flies*, N.Y. Times, Apr. 18, 2022, https://www.nytimes.com/2022/04/16/business/beta-electric-airplane.html (attached as Exhibit 1).) Blue Force produces, among other things, prototype fuselages and other aircraft structures. (Am. Compl. (D.E. 32) ¶ 2.)

BETA and Blue Force entered into the ALIA Phase I Contract on October 1, 2018. (ALIA Phase I Contract (D.E. 1-3); *see also* Answer and Countercl. (D.E. 14) at 21-22 &

---

[1] BETA is making this filing now because it is straightforward and because a ruling in its favor now will significantly streamline the remaining balance of this case.

34 (verifying that D.E. 1-3 is a true copy of the ALIA Phase I Contract).) BETA was the customer, Blue Force the "Contractor." (D.E. 1-3 at 3.) Under the "firm fixed price" ALIA Phase I Contract, Blue Force was to participate in developing structural elements for a single experimental eVTOL prototype aircraft BETA was developing in the first phase of a nascent aircraft development program. The then-identified aspirational goal of "the aircraft program," which went far beyond the work contracted for in the ALIA Phase I Contract, was to "produce sixty (60) aircraft by 2028 for United Therapeutics (UT) and a similar number for other markets (the 'ALIA Program')." (*Id.* at 3.) The ALIA Phase I Contract, however, did not include the design work necessary to develop a conforming aircraft for FAA type certification or production certification, much less the manufacture of actual production aircraft. (*Id.*) Instead, it contemplated that there would be future phases of the ALIA Program, and provided that

> BETA shall continue to grant BFT the right of first refusal to be the exclusive supplier to BETA on all tasks relating to structural design, tooling, fabrication and assembly, for both metallic and composite aircraft structures for projects for, or an aircraft substantially similar to, the ALIA configuration from UT, UT affiliates, or Dr. Martine Rothblatt. BFT shall propose such work under commercial rates consistent with what other customers have received in the preceding year. BETA shall not solicit proposals from other structures providers while making a good faith effort to come to terms with BFT.

(*Id.*) Additionally, the contract provided that "[s]uccess in the initial phase of the program will result in a subsequent contract offer for rights of first refusal from BETA to BFT for Phase 2." (*Id.* at 4.)

3

The contract also included a provision giving the parties reciprocal rights of first refusal to certain opportunities developed by one in the other's area of expertise:

> BFT shall have the non-exclusive right to perform marketing, business development, and act as prime contractor in sales to the US Government for non-production research and development activities, utilizing assets developed hereunder. BETA and BFT agree that each shall receive the right of first refusal on all design, development, research, and sales opportunities developed by the other party in its area of expertise.

(*Id.* at 11-12.)

Finally, the contract gave Blue Force the exclusive right to purchase production aircraft from BETA for subsequent resale to the United States government:

> BFT shall have the exclusive right to purchase, under commercial pricing and terms, production aircraft from BETA which will be subsequently offered for sale to the US Government ("Federal Sales") by BFT. Such Federal Sales aircraft may be modified by BFT for purposes which are specific to the US Government's needs, and BFT shall serve as prime contractor for any such modification contracts, with BETA having the right of first refusal to participate in modification work related to electric propulsion at its commercial rates.

(*Id.* at 12.)

Notwithstanding these forward-looking provisions, the contract also included several provisions allowing BETA to terminate for various reasons, including failure to meet the milestones necessary to satisfy BETA's initial customer, United Therapeutics, or Blue Force's failure to meet four successive quarterly milestones. (*Id.* at 3, 15.) In addition to these specific scenarios, the contract gave BETA "the right to terminate the contract, for convenience" subject only to the obligation that it make certain wind-down payments after termination:

4

> BETA shall have the right to terminate the contract, for convenience, but shall be required to pay BFT the pro rata portion from the date of notice of the next 30-day partial payment due as defined in Table 3 and any outstanding invoices against the Management Reserve or payment in full for all materials and services that cannot be cancelled, whichever is greater.

(*Id.* at 15.)

The ALIA Phase I Contract specifically identifies the provisions that survive following termination. (*See id.* at 15 (prohibiting solicitation of the other party's employees or consultants "*for at least 12 months after the termination* of this contract" (emphasis added)), 16 (requiring that both parties maintain professional liability insurance "throughout the life of this Agreement *and for a period of one year after final end date of this Agreement*" and requiring that BETA maintain products and completed operations insurance and flight test insurance "during the term of this contract *and for a period of one year thereafter*" (emphases added)).) No such survival language exists in the provisions granting Blue Force a right of first refusal for future phases of the ALIA Program, a right of first refusal on third-party opportunities within its area of expertise, or the exclusive right to purchase production aircraft for resale to the United States government.

## II. BETA terminated the ALIA Phase I Contract for convenience.

Kyle Clark is the founder and CEO of BETA. (Am. Countercl. (D.E. 38) ¶ 16.) Scott Bledsoe is the founder and President of Blue Force. (D.E. 32 ¶ 10.) On February 16, 2021, Clark sent a request for proposal ("RFP") for the design and manufacture of the ALIA

5

aircraft structures to Bledsoe. (Bledsoe Dep.[2] 51:25-53:22 & Ex. 11; Buzzard Dep.[3] 128:19-129:15 & Ex. 29, 131:6-25, 138:25-140:15.) On March 1, 2021, BETA provided a form Development and Supply Agreement ("DSA") to accompany the RFP. (Bledsoe Dep. 53:24-55:21 & Ex. 11; Buzzard Dep. 148:2-150:5 & Ex. 31-32.)

Blue Force repeatedly promised that it would respond to the RFP, but failed to do so for more than two months. (Buzzard Dep. 145:8-147:9 & Ex. 30, 150:6-152:10, 155:12-157:6 & Ex. 33; 161:14-162:22; Bledsoe Dep. 55:22-56:11, 60:10-61:2, 64:1-65:21.) On April 22, 2021, Blue Force told BETA that it could not perform the requested work as BETA's exclusive supplier, and proposed instead that it be assigned one specific piece of the structure (the fuselage). (Bledsoe Dep. 66:7-72:17; Buzzard Dep. 174:10-175:3.) Blue Force never submitted any formal response to BETA's RFP. (Buzzard Dep. 147:3-9; 152:2-6, 162:14-22; Bledsoe Dep. 54:14-55:16, 65:6-8, 92:6-14.)

On May 7, 2021, almost three months after sending the RFP, and two weeks after receiving Blue Force's counterproposal, Clark sent an email to Bledsoe informing him that BETA was terminating the ALIA Phase I Contract effective in 30 days. (D.E. 14-1 (termination letter); D.E. 14 at 10, 34 (verifying that D.E. 14-1 is a true copy of the termination letter); D.E. 23 ¶ 7 (same).) Among other things, Clark said "I think it makes the most sense going forward to terminate the current agreement" and "the formatility [sic]

---

[2] Selected excerpts from, and exhibits to, the deposition of Scott Bledsoe are attached as Exhibit 2.
[3] Selected excerpts from, and exhibits to, the deposition of Peter Buzzard are attached as Exhibit 3.

of this communication is we are electing to terminate our existing Phase 1 program effective in 30 days." (D.E. 14-1 at 2.) At the same time, Clark explained that BETA wanted to work with Blue Force to identify other ways it could contribute to the ALIA Program:

> Per our discussions, I think it will be great to work with BFT on a meaningful portion of the program that may include doors, fairings, flying surfaces, interior systems and/or tooling for the overall program and will invite BFT to bid this work. I think ultimately this will produce an opportunity for BFT work that is aligned with the skills infrastructure and investment at BFT and creates a valuable opportunity for BFT.
>
> . . .
>
> I look forward to aligning on a relationship that provides value to BFT and works within BFT's investment and risk profile, and additionally gives the ALIA program the highest probability of success. I think this aligns with our discussions with the adjustment of not yet defining the BFT scope of supply for production.

(*Id.* at 2-3.)

There is no dispute that this communication from BETA to Blue Force terminated the ALIA Phase I Contract effective June 6, 2021. (Bledsoe Dep. 155:22-156:4 (acknowledging that "the [ALIA Phase I] contract was terminated" and that Blue Force "received notice of termination from Clark on 05-07-21"). Nevertheless, Blue Force has at times asserted that BETA's actions were either ineffective to terminate the contract or actually wrongful, claiming that "[o]n or around May 7, 2021 Defendant further breached the ALIA Phase I Contract and the ALIA/electronic-VTOL program contractual relationship by its *wrongful termination* and the repudiation of Blue Force's rights thereunder." (D.E. 32 ¶ 49 (emphasis added); *see also id.* ¶ 50.) Similarly, Blue Force has

7

asserted that BETA "*attempted* to terminate Plaintiff from the program via written notification on May 7, 2021" (*id.* ¶ 2 (emphasis added)); that Clark's May 7, 2021 email was "*purporting* to terminate the contractual relationship between the Parties" (*id.* ¶ 45 (emphasis added)); that BETA "*inappropriately* terminated the Alia Phase I contract" (Bledsoe Decl. (D.E. 21) ¶ 10 (emphasis added)); and that the May 7, 2021 email was a "*purported* termination" of the ALIA Phase I Contract (*id.* ¶¶ 18, 24 (emphasis added)).

Blue Force's position on termination flies in the teeth of the plain language of the ALIA Phase I Contract.[4] BETA brings this motion to vindicate both its contractual right to terminate for convenience and its actual exercise of that right.

## PROCEDURAL HISTORY

On May 26, 2021, Blue Force commenced this action alleging that BETA breached the ALIA Phase I Contract, breached an alleged oral/implied contract, misappropriated trade secrets, interfered with Blue Force's prospective economic advantage, engaged in unfair or deceptive trade practices, and was unjustly enriched. (D.E. 1.) On July 6, BETA filed its Answer and Verified Counterclaims, alleging that Blue Force breached the ALIA

---

[4] Prior to reassignment of this case from Judge Eagles to this Court, Blue Force similarly asserted a position that flew in the teeth of the plain language of the ALIA Phase I Contract. Blue Force wrongly withheld BETA's intellectual property, threatening the viability of the ALIA Program and safe operation of the experimental ALIA aircraft, which is flown by test pilots. (D.E. 15-1 ¶¶ 12-27.) BETA sought an emergency temporary restraining order and Judge Eagles issued a **mandatory** temporary restraining order, since converted into a preliminary injunction, requiring that Blue Force provide the intellectual property and data, which it did. (D.E. 25 (Temporary Restraining Order); D.E. 29 (Order converting temporary restraining order into preliminary injunction)). The intellectual property unquestionably belongs to BETA and Judge Eagles ordered it to be delivered. (D.E. 25 at 5, 7-8.)

Phase I Contract, breached the implied covenant of good faith and fair dealing, and converted certain BETA property. (D.E. 14.) Both parties sought declaratory relief on various issues.

On the same day that it filed its Answer and Verified Counterclaims, as noted in footnote 4, *supra*, BETA filed an emergency request for a Temporary Restraining Order seeking to obtain BETA property that Blue Force was withholding from it. (D.E. 15.) On July 13, after a hearing, the Court entered a Temporary Restraining Order requiring Blue Force to provide the property to BETA. (D.E. 25.) The Court subsequently converted that TRO into a preliminary injunction on July 26 with the parties' consent. (D.E. 29.)

On July 27, Blue Force filed its First Amended Complaint, which added claims for tortious interference with contract and breach of the implied covenant of good faith and fair dealing. (D.E. 32.) That same day, Blue Force filed its Answer to BETA's Verified Counterclaims. (D.E. 31.) On August 17, BETA filed its Answer to the First Amended Complaint and its Verified Amended Counterclaims. (D.E. 38.) On August 31, Blue Force filed its Answer to BETA's Verified Amended Counterclaims. (D.E. 39.)

On October 22, BETA moved for judgment on the pleadings on five of Blue Force's ten claims (D.E. 45) and for judgment on the pleadings or partial summary judgment on aspects of its breach of contract claim and declaratory judgment claim (D.E. 47). On December 9, the Court denied BETA's motion for judgment on the pleadings on five Blue Force claims. (D.E. 57.) On January 14, 2022, after having requested and received supplemental briefing, the Court granted in part BETA's motion for partial judgment on

the pleadings and granted declaratory relief to BETA on its ownership of certain intellectual property, deliverables, data, and results generated by Blue Force in performing the ALIA Phase I Contract and its irrevocable, transferrable, perpetual, non-exclusive, royalty-free, fully-paid license rights to certain manufacturing technologies and processes developed by Blue Force in performing the ALIA Phase I Contract. (D.E. 65.) On February 4, 2022, after requesting and receiving a joint submission from the parties (D.E. 66), the Court reduced the bond associated with the preliminary injunction from $1.7 million to $424,896.32 (D.E. 68).

## QUESTIONS PRESENTED

I.      Is BETA entitled to declaratory relief establishing that (1) BETA was entitled to terminate the ALIA Phase I Contract for convenience; (2) BETA did in fact terminate the ALIA Phase I Contract for convenience effective June 6, 2021; and (3) as a result of that termination, since June 6, 2021, Blue Force has had no further right of first refusal or any other expectation of special treatment by BETA in connection with the ALIA Phase I Contract or ALIA Program?

II.     Is BETA is entitled to summary judgment on Blue Force's claim that BETA wrongfully terminated or attempted to terminate ALIA Phase I Contract where it is undisputed that BETA had an express contractual right to terminate the ALIA Phase I Contract for convenience and exercised that right effective June 6, 2021?

10

## ARGUMENT

*"BETA shall have the right to terminate the contract, for convenience . . . ."*

### I.    BETA had the express right to terminate the ALIA Phase I Contract for convenience.

Delaware law governs the ALIA Phase I Contract. (D.E. 1-3 at 15.) Delaware law strictly enforces the plain language of agreements and establishes that proper interpretation of language in a contract is a question of law. *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). When interpreting a contract, a court will start its analysis "by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). "In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." *Id.* (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)). Further, "[c]ontract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). "When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning." *Allied Cap.*, 910 A.2d at 1030. Put another way, when a contract is unambiguous, a court will enforce its plain meaning and will not rewrite a contract "because one party now regrets a deal it struck." *Yatra Online, Inc. v. Ebix, Inc.*, No. CV 2020-0444-JRS, 2021 WL 3855514, at *10 (Del. Ch. Aug. 30, 2021), *aff'd*, No. 294, 2021,

2022 WL 1073548 (Del. Apr. 11, 2022); *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (explaining the Court will "not rewrite the contract to appease a party who later wishes to rewrite a contract"); *see also NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties."); *Hallisey v. Artic Intermediate, LLC*, No. CV 2019-0980-MTZ, 2020 WL 6438990, at *3 (Del. Ch. Oct. 29, 2020) ("Delaware courts strictly construe and enforce all contracts, especially those negotiated by sophisticated parties or parties with sophisticated counsel.")

The ALIA Phase I Contract gave BETA the express, unambiguous right to "terminate the contract, for convenience." (D.E. 1-3 at 15.) Under Delaware law, the right to terminate for convenience generally means that a party can terminate a contract at its convenience, at any time and for any reason, barring explicit contract terms to the contrary. *See e.g., Raytheon Co. v. BAE Sys. Tech. Sols. & Servs. Inc.,* No. CVN17C02079PRWCCLD, 2017 WL 5075376, at *8 (Del. Super. Ct. Oct. 30, 2017) (applying New York law and finding that termination for convenience would have been effective under contract that explicitly allowed for it); *Betal Env't Corp. v. Loc. Union No. 78, Asbestos, Lead & Hazardous Waste Laborers*, 162 F. Supp. 2d 246, 260 (S.D.N.Y. 2001) (finding a termination for convenience under a clause that allowed for termination "at any time for any reason or for no reason," but called for certain wind-down payments, to be effective), *aff'd sub nom. Betal Env't Corp. v. Loc. Union No. 78*, 39 F. App'x 688 (2d Cir. 2002); *Lockheed Martin Transportation Sec. Sols. v. MTA Cap. Constr. Co.*, No. 09 CIV. 4077 (PGG), 2014 WL 12560686, at *31

(S.D.N.Y. Sept. 16, 2014) (holding that a termination for convenience, even if in bad faith, would be effective under a contract that is terminable without cause); *Vila & Son Landscaping Corp. v. Posen Const., Inc.*, 99 So. 3d 563, 568 (Fla. Dist. Ct. App. 2012) (finding termination for convenience effective despite argument that termination was in bad faith); *see also Schwartz v. Fortune Mag.*, 89 F. Supp. 2d 429, 434 (S.D.N.Y. 1999) (stating that the "court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause"); *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) ("Under Delaware law, sophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."). This is in contrast to termination for cause or termination following the occurrence of specified events. *See Harris Corp. v. Giesting & Assocs.*, Inc., 297 F.3d 1270, 1273 (11th Cir. 2002) (noting the distinction between a termination for convenience clause, allowing for termination "without cause," and a "termination for cause" clause. In effect, it allows a party to terminate without cause. *Id.*; *Raytheon*, 2017 WL 5075376, at *8; *Betal Env't Corp*, 162 F. Supp. 2d at 260; *Lockheed Martin*, 2014 WL 12560686, at *31.

## II. BETA properly terminated the ALIA Phase I Contract for convenience effective June 6, 2021.

### A. BETA gave written notice of termination.

BETA gave written notice of termination on May 7, 2021. That notice is selectively quoted in Blue Force's Complaint and Amended Complaint (D.E. 1 ¶ 44; D.E. 32 ¶ 45), but was attached in full to BETA's Verified Counterclaims (D.E. 14-1; *see also* Am.

Countercl. (D.E. 38) ¶ 45.) While Blue Force hems and haws about its effectiveness, and casts it as "wrongful" and "inappropriate," there is no dispute that Blue Force actually received it and understood it as notice of termination. (Bledsoe Dep. 155:22-156:4 (acknowledging that "the [ALIA Phase I] contract was terminated" and that Blue Force "received notice of termination from Clark on 05-07-21").

### B.    BETA made all wind-down payments.

The only qualification on that right is that after giving notice of termination for convenience, BETA was required to make certain wind-down payments,[5] and that certain contractual provisions, as expressly noted in the ALIA Phase I Contract (*supra* at 4-5), survive termination. Blue Force does not argue that BETA failed to make those wind-down payments. Indeed, Blue Force has not asserted any claim that BETA failed to pay the amounts due under the contract. To the contrary, the parties have jointly represented to the Court as follows: "BETA and Blue Force also agree that there is no claim by either party in the case asserting any account receivable." (Joint Submission (D.E. 66) at 1.) As a result, it is undisputed that BETA both: (i) gave written of notice of termination and (ii) made any and all wind-down payments due under the agreement. Thus, it is beyond dispute that BETA terminated the ALIA Phase I Contract for convenience.

---

[5] The ALIA Phase I Contract does not provide that BETA was required to make these payments for the termination to take effect, only that it was obligated to make these payments "after termination." (D.E. 1-3 at 15.) In other words, termination for convenience triggered an obligation to make the wind-down payments, but termination was not contingent on actually making those payments.

14

It is unclear what Blue Force's objection is to enforcement of the plain language of the ALIA Phase I Contract, but the explanation for the dispute may lie with the parties' respective advancement on the one hand, versus stagnation on the other. BETA, initially just a startup of one brilliant engineer, has expanded rapidly in just a few years, as it demonstrated real promise with its renewable novel electric propulsion technology, which has the potential to transform aerospace worldwide. For example, in May of last year it announced a "Series A" funding round of $368 million, which was led by Amazon's Climate Pledge Fund and Fidelity, who are seeking to fund the eVTOL technology, renewable aviation propulsion, which will "reshape air transportation through zero-emission aviation." (D.E. 15-1 ¶ 11; D.E. 15-1 at 15-20.) Just last month, in a "Series B" funding round, BETA raised an additional $375 million led by TPG's Rise Climate fund. (Alan Ohnsman, *Aircraft Startup Beta Raises $375 Million for Electric Cargo Copter, Charging Business*, Forbes (Apr. 20, 2022, 8:00 AM), https://www.forbes.com/sites/alanohnsman/2022/04/20/aircraft-startup-beta-raises-375-million-for-electric-cargo-copter-charging-business/?sh=1ff7890b1ce4 (noting that BETA's valuation is $2.4 billion) (attached as Exhibit 4); *see also* Ex. 1.)

Blue Force, however, remains what it has been since the inception of the relationship, REDACTED ████████████████████████████████████

████████████████. (Bledsoe Dep. 225:1-226:14, 258:15-20, 267:5-19.)

While it is unclear, Blue Force appears to contend that the termination of the ALIA Phase I Contract was somehow rendered ineffective by alleged breaches of the ALIA Phase

15

I Contract, and alleged bad faith conduct, by BETA prior to the termination of the ALIA Phase I Contract. (Bledsoe Dep. 194:17-206:15.) However, nothing in the ALIA Phase I Contract suggests that a breach of the ALIA Phase I Contract would have any impact on BETA's right to subsequently terminate for convenience. Further, Blue Force's theory seems to be that BETA breached the ALIA Phase I Contract by having communications with other third parties relating to structures for ALIA Aircraft. (Bledsoe Dep. 122:5-124:25, 145:22-148:12.) The notion that the right of first refusal granted to Blue Force was essentially a gag order that prevented BETA from discussing structures for the ALIA aircraft with any third party makes no sense and it certainly does not overcome the plain language of the termination for convenience right. (D.E. 1-3 at 15.)

Moreover, the evidence before the Court makes clear that BETA acted in *good faith* when it terminated the ALIA Phase I Contract. As noted, *supra* at 5-6, BETA issued a Request for Proposal to Blue Force, which Blue Force did not respond to. Instead, Blue Force made clear that it could not perform the work that future stages of the ALIA Program required and proposed that it perform alternative work. REDACTED

. (Buzzard Dep. 50:12-51:5, 62:1-7, 177:22-178:11.) Even in terminating the ALIA Phase I Contract, BETA made clear that it still anticipated that Blue Force would have a meaningful role in the ALIA Program, but Blue Force sued BETA before BETA had a chance to engage Blue Force. (D.E. 14-1 at 2-3.)

**III.** **Once BETA terminated the ALIA Phase I Contract, Blue Force ceased to have any right of first refusal or right to special treatment by BETA in connection with the ALIA Phase I Contract or ALIA Program.**

Terminating a contract generally extinguishes the parties' obligations under the contract. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441-42 (2015) (addressing collective bargaining agreements); *Derma Pen, LLC v. 4EverYoung Ltd.*, No., 2014 WL 3817133, at *5 (D. Utah Aug. 4, 2014) (unpublished) ("Terminating a contract ends the contract going forward and relieves the parties from future performance of the obligations under the contract." (quotation omitted)); *Am. Litho, Inc. v. Imation Corp.*, No. 08–CV–5892 (JMR/SRN), 2010 WL 681275, at *4 (D. Minn. Feb. 23, 2010) (unpublished) (same); *Yatra*, 2021 WL 3855514, at *10 (holding that termination of contract extinguished rights under the contract).

As addressed above, it is beyond dispute that BETA terminated the ALIA Phase I Contract for convenience. When the termination occurred, any of Blue Force's contractual rights under the ALIA Phase I Contract that did not explicitly survive termination were extinguished.

The presence of a so-called "survival clause" encompassing a "right of first refusal" would allow that provision to survive termination, *N.E. Capital & Advisory, Inc. v. Del. Bancshares, Inc.*, No. 903165–16, 2018 WL 1802224, at *4 (N.Y. Sup. Ct. Apr. 3, 2018) (unpublished table decision). Conversely, the absence of a survival clause encompassing the right of first refusal means that the right of first refusal *does not* survive termination. *See, e.g., Stonington Capital Advisors, LLC v. Southfield Capital, LLC*, No. 20 Civ. 6053

17

(ER), 2021 WL 1168237, at *5-6 (S.D.N.Y. Mar. 25, 2021) (unpublished) (holding that a right of first refusal did not survive termination because the right was "not expressly defined as surviving the Agreement's termination provision"); *In re Casiano Comms. Inc.*, 2015 WL 4593921, at *2 (Bankr. D.P.R. July 29, 2015) (unpublished) (stating that "[t]he 'right of first refusal' clause has no independent existence . . . . [n]othing in subparagraph 2.12, or in any other section of the Agreement, plainly states that this particular right shall survive the termination of the Agreement" and the party's "stance that their 'right of first refusal' survives *ad infinitum* after the termination of the Agreement . . . would lead to an absurd legal conclusion"); *Sands Bros. & Co., Ltd. v. Hyseq, Inc.*, No. 96 Civ. 3469(KMW), 1997 WL 626547, at *4-5 (S.D.N.Y. Oct. 7, 1997) (unpublished) (reasoning that where parties intend a right of first refusal to survive termination they explicitly provide for such survival); *see also Bateman v. 317 Rehoboth Ave., LLC*, 878 A.2d 1176, 1185 (Del. Ch. 2005) (holding that lease's right of first refusal did not survive termination of lease in light of Delaware landlord-tenant law), *affirmed*, 889 A.2d 283 (Del. 2005); 25 Williston on Contracts § 67:89 (4th ed.) ("If the right of first refusal is part of another document, such as a lease agreement, then the expiration or termination of the lease will effectively terminate the right of first refusal . . . .").

Here, the ALIA Phase I Contract does not include any survival provision for Blue Force's rights of first refusal or right to purchase and resell to the United States government. (*Supra* at 3-4.) When the parties contemplated that a right would survive termination, they provided for it. Specifically, the parties included a provision prohibiting

18

solicitation of the other party's employees or consultants "*for at least 12 months after the termination* of this contract." (D.E. 1-3 at 15 (emphasis added)). Likewise, the parties included provisions requiring that both parties maintain professional liability insurance "throughout the life of this Agreement *and for a period of one year after final end date of this Agreement*" and requiring that BETA maintain products and completed operations insurance and flight test insurance "during the term of this contract *and for a period of one year thereafter*." (*Id.* at 16 (emphases added).) If the parties had intended that other provisions of the contract survive termination for convenience, they could have so provided in the contract. *See, e.g., Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, No. CVN20C08055AMLCCLD, 2021 WL 3235739, at \*27 & n. 263 (Del. Super. Ct. July 29, 2021) (noting that courts "routinely find" that the exclusion of certain language in a contract, where the parties "clearly knew how to" include the language at issue, is "intentional and a byproduct of negotiation") (collecting cases). They did not, and thus BETA's termination of the ALIA Phase I Contract extinguished Blue Force's rights of first refusal and right to purchase and resell to the United States government.

## CONCLUSION

The ALIA Phase I Contract speaks plainly: BETA had the express right to terminate the contract "for convenience." It is undisputed that BETA exercised that right on May 7, 2021, when its CEO notified Blue Force's CEO that BETA was terminating the ALIA Phase I Contract effective June 6, 2021. It is also undisputed, as the parties have jointly represented to this Court, that BETA has made all payments due under the ALIA Phase I

19

Contract. As a result, Blue Force's rights of first refusal and right to purchase and resell to the United States government have been extinguished, and BETA is entitled to a declaratory judgment establishing that (1) BETA was entitled to terminate the ALIA Phase I Contract for convenience; (2) BETA did in fact terminate the ALIA Phase I Contract for convenience effective June 6, 2021; and (3) as a result of that termination, Blue Force has no further right of first refusal or any other expectation of special treatment by BETA in connection with the ALIA Phase I Contract or ALIA Program. Moreover, BETA is entitled to summary judgment in its favor on Blue Force's breach of contract claim alleging that BETA "wrongfully terminated" or wrongfully "attempted to terminate" the ALIA Phase I Contract.

This the 13th day of May, 2022.

/s/ Christopher G. Smith
Christopher G. Smith
N.C. State Bar No. 22767
csmith@smithlaw.com
Isaac A. Linnartz
N.C. State Bar No. 39858
ilinnartz@smithlaw.com
David A. Pasley
N.C. State Bar No. 52332
dpasley@smithlaw.com
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.
Post Office Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800

*-and-*

Jacqueline T. Menk
jmenk@bakerlaw.com
G.A. State Bar No. 728365
BAKER & HOSTETLER LLP
1170 Peachtree Street NE
Suite 2400
Atlanta, GA 30309
Telephone:  (404) 946-9776
Facsimilar:  (404) 459-5734

*Attorneys for BETA Technologies, Inc.*

21

## CERTIFICATE OF COMPLIANCE WITH LR 7.3(d)(1)

I hereby certify that this Memorandum of Law in Support of BETA Technologies, Inc.'s Motion for Partial Summary Judgment complies with Local Rule 7.3(d)(1) and does not exceed 6,250 words.

This the 13th day of May, 2022.

/s/ Christopher G. Smith
Christopher G. Smith
N.C. State Bar No. 22767
csmith@smithlaw.com
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.
Post Office Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800

*Attorneys for BETA Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to all attorneys of record.

This the 13th day of May, 2022.

/s/ Christopher G. Smith
Christopher G. Smith
N.C. State Bar No. 22767
csmith@smithlaw.com
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.
Post Office Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800

*Attorneys for BETA Technologies, Inc.*

23